## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

Janine LaVigne, *on behalf of herself and all others similarly situated*,

        Plaintiff,

  -against-

First Community Bancshares, Inc.; First National Bank Texas; DOES 1-10, inclusive,

        Defendants.

Civil Action No.: 1:15-cv-00934-WJ-LF

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................... ii

PERTINENT PROCEDURAL BACKGROUND ...................................................... 3

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................ 4

   I.    The Overdraft Call Dialing Program ............................................................ 4

   II.   The Overdraft Calls are Made by a Predictive Dialer ATDS ......................... 4

   III.  Defendants' Vendor Systematically Records Call Outcomes and Provides the Information to Defendants; Defendants Systematically Fail to Heed Notifications of Calls to the 'Wrong Number' ................................................................... 7

   IV.  Plaintiff, Like the Class, Received Automated Calls *After* Informing Defendants on a Call to Defendants that they were Calling the Wrong Number ...................... 8

THE TELEPHONE CONSUMER PROTECTION ACT ......................................... 10

ACA INTERNATIONAL ....................................................................................... 10

   I.    ACA International's Impact on ATDS ......................................................... 10

   II.   *ACA International's* Impact on Wrong Number Calls .................................. 13

ARGUMENT ......................................................................................................... 15

   I.    LEGAL STANDARD ................................................................................. 15

   II.   PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ......................... 16

      A.   DEFENDANT USED AN AUTOMATIC TELEPHONE DIALING SYSTEM TO CALL PLAINTIFF'S CELLULAR TELEPHONE .................................... 16

        1.  The Aspect dialer is an ATDS under the 2003 and 2008 FCC Orders ...................... 16

        2.  The Aspect dialer is an ATDS under the statutory language as set forth in *Heard* and *Somogyi* ................................................................................ 19

        3.  The Aspect dialer is an ATDS under the statutory language as set forth in *Marks* .... 22

        4.  Defendant's interpretation of an ATDS is incorrect and would lead to absurd results……………..……………………………………………………………24

      B.   SUMMARY JUDGMENT SHOULD ENTER ON DEFENDANTS' PRIOR EXPRESS CONSENT DEFENSE .......................................................... 25

CONCLUSION .................................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Ocwen Loan Servicing, LLC,* No. 18-81028 (S.D. Fla., Oct. 29, 2018) ................ 22, 23

*Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578 (M.D. Tenn. 2018) .................................. 1, 13, 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986) ...................................... 15

*Armijo v. FedEx Ground Package Sys., Inc.*, 285 F. Supp. 3d 1209 (D.N.M. 2018) .................. 24

*Bray v. PNC Bank, N.A.*, 196 F. Supp. 3d 1282 (M.D. Fla. 2016) ................................................ 10

*Conaway v. Smith*, 853 F.2d 789 (10th Cir. 1988) ....................................................................... 15

*Davis v. Diversified Consultants, Inc.*, 36 F. Supp. 3d 217 (D. Mass. 2014) .............................. 17

*Espejo v. Santander Consumer USA, Inc.*, 2016 WL 6037625 (N.D. Ill. Oct. 14, 2016)............. 16

*Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265 (3d Cir. 2013) ...................................................... 10

*Hartley-Culp v. Credit Mgmt. Co.*, 2014 WL 4630852 (M.D. Pa., Sept. 15, 2014)..................... 10

*Heard v. Nationstar Mortg. LLC*, 2018 WL 4028116 (N.D. Ala. Aug. 23, 2018) ............. 2, 19, 20

*Henrichs v. Wells Fargo Bank, N.A.*, 2014 WL 985558 (N.D. Cal., March 7, 2014) .................. 10

*Hom v. Squire*, 81 F.3d 969 (10th Cir. 1996) .............................................................................. 15

*Hudson v. Sharp Healthcare*, 2014 WL 2892290 (S.D. Cal., June 25, 2014).............................. 10

*Levy v. Receivables Performance Mgmt., LLC*, 972 F. Supp. 2d 409 (E.D.N.Y. 2013).............. 10

*Maddox v. CBE Group, Inc.*, 2018 WL 2327037 (N.D. Ga. May 22, 2018) ................................ 13

*Manuel v. NRA Grp., LLC*, 200 F. Supp. 3d 495 (M.D. Pa. 2016) ......................................... 17, 18

*Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018).................................... 2, 22, 23

*McMillion v. Rash Curtis & Assocs.*, 2018 WL 3023449, at *3 (N.D. Cal. June 18, 2018) ........ 13

*Morse v. Allied Interstate, LLC*, 65 F. Supp. 3d 407 (M.D. Pa. 2014) ........................................ 16

*O'Shea v. Am. Solar Sol., Inc.*, 2018 WL 3217735 (S.D. Cal. July 2, 2018) ............................... 13

*Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014).................................. 14, 25, 26

*Pieterson v. Wells Fargo Bank, N.A.,* 2018 WL 3241069 (N.D. Cal. July 2, 2018) ........ 13, 14, 26

*Reyes v. BCA Fin. Servs., Inc.*, 312 F. Supp. 3d 1308 (S.D. Fla. 2018) .................................. 12, 18

*Robbins v. Chronister*, 435 F.3d 1238 (10th Cir. 2006) ............................................................. 24

*Somogyi v. Freedom Mortg. Corp.,* 2018 WL 3656158 (D.N.J. Aug. 2, 2018) .......................... 21

*Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012) ................................. 14, 26

*Sterk v. Path, Inc.*, 46 F. Supp. 3d 813 (N.D. Ill. 2014) ............................................................. 17

*Sterling v. Mercantile Adjustment Bureau, LLC.*, 2014 WL 1224604
    (W.D.N.Y. Mar. 25, 2014)................................................................................................ 14, 25

*Swaney v. Regions Bank,* No. 13-00544, 2018 WL 2316452
    (N.D. Ala. May 22, 2018) ................................................................................. 10, 13, 16, 18

*Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976 (10th Cir. 2002).................................... 15

*Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017)............................. 10, 25

*Warnick v. Dish Network LLC*, 2014 WL 12537066 (D. Colo. Sept. 30, 2014) ................... 14, 25

*Zeidel v. A&M (2015) LLC*, 2017 WL 1178150 (N.D. Ill. Mar. 30, 2017) ........................... 11, 16

## Statutes

47 U.S.C. § 227 ............................................................................................................................. 1

47 U.S.C. § 227(a)(1)..................................................................................................................... 2

## Rules

Fed. R. Civ. P. 56.......................................................................................................................... 15

## Regulations

*In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991,* 18
    FCC Rcd. 14,014 (2003).......................................................................................................... 1, 11

iii

*In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23
    FCC Rcd. 559 (2008) ........................................................................................................... 11

*In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991,* 30
    FCC Rcd. 7961 (2015) ......................................................................................................... 11

Plaintiff, Janine LaVigne ("LaVigne" or "Plaintiff"), on behalf of herself and the Class, by and through her undersigned counsel, hereby submits this Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment.

The Defendants through their vendor used an Aspect Unified IP predictive dialer to place automated calls to the cellular telephone numbers of Plaintiff and the Class she represents, none of whom are Defendants' customers. This was done *after* Class members specifically called in and informed Defendants they were calling the wrong number. Defendants ignored these notices and kept calling. This conduct is in clear violation of the Telephone Consumer Protection Act ("TCPA" or the "Act"), 47 U.S.C. § 227(b)(1)(A)(iii), which requires the prior express consent of the called party before such calls can be made.

Defendants contend that a decision by the D.C. Circuit in *ACA International v. Federal Communications Commission*, 885 F.3d 687, 693 (D.C. Cir. 2018), which set aside, in part, a 2015 Federal Communication Commission ("FCC") omnibus order regarding the TCPA, makes the Aspect dialer not an automatic telephone dialing system ("ATDS") under the Act and provides them a consent defense to Plaintiff's and the Class's claims. Defendants are wrong. The Aspect dialer is *such* a dialer that it meets the definition of ATDS in multiple ways:

(1) It is an ATDS under the Federal Communication Commission's 2003 Order, *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14,014, 14090-92 (2003), because it stores a list of numbers, can dial those numbers at random, in sequential order, or from a database of numbers and it dials without human intervention. The 2003 Order was not set disturbed by *ACA*. *See, e.g.*, *Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578, 587 & 589 (M.D. Tenn. 2018) ("In the wake of *ACA International*, this Court joins the growing number of

1

other courts that continue to rely on the interpretation of § 227(a)(1) set forth in prior FCC rulings.") (finding a predictive dialer is an ATDS as a matter of law) (summary judgment for plaintiff).

(2) It is an ATDS under the statutory definition set forth in the TCPA itself (47 U.S.C. § 227(a)(1)) because it stores numbers and generates those numbers *in a sequence* for dialing. *Heard v. Nationstar Mortg. LLC*, 2018 WL 4028116, at *6 (N.D. Ala. Aug. 23, 2018) ("iAssist then dials the numbers as sequenced and connects the call to a Nationstar representative only if someone answers the call that iAssist initiated.") (summary judgment for plaintiff).

(3) And it is an ATDS under the statutory definition because, as the Ninth Circuit Court of Appeals recently held, that definition "is not limited to devices with the capacity to call numbers produced by a 'random or sequential number generator,' but also includes devices with the capacity to dial stored numbers automatically." *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018).  The Aspect dialer as used here functioned in exactly this way.

Because there is no issue of material fact that the Aspect dialer is an ATDS, summary judgment should enter in favor of Plaintiff and the Class on this issue.

Second, *ACA* did not create any safe harbor or exceptions to the requirements that Defendants obtain the prior express consent of the called party before placing autodialed calls. *ACA* set aside the FCC's 2015 order regarding reassigned numbers and called parties because the Court could not find logic in the FCC's creation of a one (1) call exception to wrong party calls. Having set aside the order, we are and remain (as with ATDS) in a pre-2015 FCC Order legal framework.  In that framework, the TCPA's requirement of the consent of the called party means

just that; the consent of the called party and not the intended recipient.  Moreover, where Defendants ignored notices from class members that they were calling the wrong number, no safe harbors would ever apply to Defendants' conduct here.  Because there is no issue of material fact that Defendants did not have the prior express consent of any class member to place automated calls to their cellular telephone, summary judgment should enter in favor of Plaintiff and the Class on this issue.

## PERTINENT PROCEDURAL BACKGROUND

On May 20, 2016, Plaintiff filed her Second Amended Complaint, the operative complaint, seeking relief for herself and all others similarly situated for Defendants' violations of the TCPA. (Doc. No. 41).

On March 17, 2017, Plaintiff moved for class certification. (Doc. No. 74).  On June 5, 2018, the Court certified the following class:

> All persons who, since November 11, 2012, (1) called First National Bank Texas and First Community Bancshares, Inc., through their vendor GC services, and such call was coded "Bad/Wrong Number" and (2) were subsequently called again by First National Bank Texas and First Community Bancshares, Inc., on their cellular telephones through their vendor GC Services with an automatic telephone dialing system and such call was again coded as 'Bad/Wrong Number.' Excluded are customers of First National Bank Texas or First Community Bancshares, Inc.

(Doc. No. 134).

On August 31, 2018, Defendants moved for leave to file a motion for summary judgment. (Doc. No. 141).  On September 14, 2018, Plaintiff responded that she did not oppose Defendants' request provided that she also be permitted to move for summary judgment. (Doc. No. 143).  On October 3, 2018, the Court granted Defendants' motion and permitted the parties file simultaneous motions for summary judgment no later than October 31, 2018. (Doc. No. 149).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.    The Overdraft Call Dialing Program**

1.    Defendant First National Bank Texas (the "Bank") is a regional consumer bank with 307 locations throughout Texas, New Mexico and Arizona. (Taylor Decl. Ex. A, Pelache Tr. at 88:11-18).

2.    First National Bank Texas is a wholly owned subsidiary of Defendant First Community Bancshares, Inc. (Pelache Tr. at 23:11-12).

3.    When customers overdraft accounts by more than $25, the Defendants seek to call them about the delinquency. (Pelache Tr. at 9:10-11; 12:20-13:7; 24:17-25).

4.    The Defendants contract with a vendor named GC Services to make these overdraft calls on their behalf. (Pelache Tr. at 23:18-24:7).

5.    The services provided by GC Services for the Bank are called "first-party receivables" in which GC Services calls on behalf of, and uses the name of, the Bank, which has the intended effect of the called person believing they are interacting with the Bank, rather than the vendor GC Services. (Taylor Decl. Ex. B, Schordock Tr. at 93:7-24).

6.    The Bank employee in charge of managing the vendor, and Rule 30(b)(6) designee, knows of no instructions or guidelines the Bank places on GC Services regarding the making of these calls. (Pelache Tr. at 11:8-15; 24:17-25:14 ("We don't provide GC Services any instructions.")).

**II.    The Overdraft Calls are Made by a Predictive Dialer ATDS**

7.    GC Services makes the overdraft calls using a "predictive dialing system" called the "Aspect Unified IP" (the "Aspect dialer"), which is the only predictive dialer used to make the calls at issue in this case. (Schordock Tr. at 9:4-10:4).

4

8.     The Aspect dialer stores telephone numbers to be dialed in the future: six nights a week, the Bank electronically sends GC Services a "listing of accounts" which gets "loaded automatically" into the Aspect system. (Schordock Tr. at 9:2-18; Pelache Tr. at 10:16-11:2; *see also* Schordock Tr. at 99:1-7 ("[I]t's automated now. . . . [W]e come in [the next morning] and it's loaded in the dialer already." & "[I]f it runs smoothly, it's just there and done.")).

9.     The telephone numbers associated with the accounts are stored in the Aspect dialer for dialing the following day. (Schordock Tr. at 10:23-11:4).

10.    Every day, the Aspect dialer dials through the previously-loaded list of numbers. (Schordock Tr. at 9:2-23).

11.    The Aspect dialer's actual dialing of telephone numbers is fully automatic without any human involvement, i.e. "the dialer dials" and it is only when a call is answered that the system routes the call to a live GC Services' agent. (Schordock Tr. at 9:2-23).

12.    Indeed, the Aspect dialer can determine, on its own, whether the recipient of a call answers the phone or not. (Schordock Tr. at 12:10-23).

13.    If the Aspect dialer determines that someone answers the call, the dialer itself "will pass it to an agent that's available, but if it is a disconnected number" the dialer will not send the call to an agent. (Schordock Tr. at 13:3-7).

14.    When a person does answer a call, they hear a prerecorded message stating "please hold" when an agent is unavailable while the calls is routed to a live representative. (Schordock Tr. at 17:20-18:10; Taylor Decl. Ex. C, LaVigne Tr. at 41:21-42:2 ("The conversation always sounded like a recording, 'Please hold while we connect you with the next representative.'")).

15.     Calls that are not answered are terminated by the Aspect dialer without any live person at GC Services being involved. (Schordock Tr. at 9:10-18; 12:20-13:6).

16.     The Aspect dialer makes the calls based on an "algorithm" (Schordock Tr. 11:5-9) based on "parameters set for it." (Schordock Tr. 12:5-9; *see also* Schordock Tr. 100:19-101:2).

17.     The dialing campaign places numbers in a sequence to be called, by "descending order by balance or number of days overdrawn," which can be "flipped" and called "from the other end the next day, [to] make sure you're saturating all the accounts."  (Schordock Tr. 99:24-100:6).

18.     The Aspect dialer also automatically limits the number of calls it makes a day: five per account and three per unique number (some accounts have multiple associated telephone numbers). (Schordock Tr. at 11:10-19; 95:22-96-3).

19.     The Aspect dialer chooses what numbers to dial and when based on its automated organization of the accounts into "campaigns." (Schordock Tr. at 100:16-101:2).  (A campaign is a group of accounts with at least one like-characteristic, for example the time zone in which the customer associated with the account lives. *Id*. at 21:23-22:24.)

20.     The Aspect dialer is pre-programmed to treat all accounts within a given campaign the same, and thus can and does dial the numbers based on entirely pre-programmed logic with no human involvement. (Schordock Tr. at 22:16-21).

21.     GC Services does not perform any "scrub" of its calling lists, either before or after calling, to determine whether it is calling telephone numbers dedicated to cellular or landline phones. (Schordock Tr. at 77:22-78:5 ("[W]e don't know . . . what's a cellular number and what isn't."); 81:6-82: 25 ("[W]e don't know which [numbers] are cell phones.  I mean, the dialer dials . . . based on what the client gives us."), 87:5-14).

III. **Defendants' Vendor Systematically Records Call Outcomes and Provides the Information to Defendants; Defendants Systematically Fail to Heed Notifications of Calls to the 'Wrong Number'**

22. Defendants' vendor GC Services maintains a system for logging and providing the Bank with information regarding the execution and outcome of all calls: the outcome of every call is logged either (1) automatically by the system on calls not answered and thus handled entirely by the system itself, or (2) by GC Services' live representatives based on trained policies and procedures according to what happens on the call. (Schordock Tr. at 13:3-12 (calls not answered are assigned a code by the system); 25:2-24 ("Answering Machine" disposition selected by system); 27:1-22 ("Bad/Wrong Number" disposition selected by representative)).

23. GC Services has produced a spreadsheet over 14,000 pages long detailing calls made or received from November 11, 2012, through April 8, 2016 with the "Bad/Wrong Number" disposition code. (Taylor Decl. ¶ 5). A representative, and the first, page from that log is attached as Exhibit D to the Taylor Declaration.

24. The spreadsheet – which is organized into 14 columns consisting of information such as call date and times, the number called or calling in, and the agent disposition of a call as "Bad/Wrong Number" – includes a column titled "CALLTYPEID" that indicates whether a call is "inbound or outbound," i.e., whether it is a call the dialer makes or a call the vendor receives from a consumer. (Schordock Tr. at 43:1-4).

25. Where the number '2' appears in the "CALLTYPEID" column, it is an outbound call by the dialer, (Schordock Tr. at 43:1-4), and where the number '1' appears in the "CALLTYPEID" column, it is an inbound call by a consumer. (Schordock Tr. at 72:13-18; 49:8-18). Thus, the log shows inbound calls from consumers which were logged as "Bad/Wrong

Number" in addition to outbound calls to consumers which were logged as "Bad/Wrong Number."

26.     When the system dials a number and a person answers and tells the representative "I'm not the person you're looking for," the disposition entered is "Bad/Wrong Number." (Schordock Tr. at 27:1-10).

27.     When the "Bad/Wrong Number" code is inputted, the system blocks calls to that number for the rest of the day, but not the next day. (Schordock Tr. at 27:23-28:2).

28.     As with outgoing calls, incoming calls can likewise be coded "Bad/Wrong Number." (Schordock Tr. at 43:1-4).

29.     Where an incoming call is marked "Bad/Wrong Number," it signifies that a consumer (1) received a call from the 888-220-7549 number, (2) called back that number, and (3) told the representative "you're calling the wrong number."  (Schordock Tr. at 49:22-51:18).

30.     GC Services reports the outcome of all calls, including the "Bad/Wrong Number" calls, back to the Bank "[e]very night." (Schordock Tr. at 28:4-16). (Bad/wrong number" corresponds with code number "98" which is sent back to the Bank every night. (Schordock Tr. at 45:21-46:8).)

31.     The Bank then provides GC Services a fresh list of numbers to be called the next day – absent any information regarding prior dialing history to that number and including numbers previously designated "Bad/Wrong Number." *Id*. at 28:1-29:7.

### IV.     <u>Plaintiff, Like the Class, Received Automated Calls *After* Informing Defendants on a Call to Defendants that they were Calling the Wrong Number</u>

32.     Plaintiff obtained her cellular telephone number ending in -4951 in March of 2014. (LaVigne Tr. at 7:25-8:15).

33.     Upon acquiring the new telephone number, Plaintiff began receiving calls from Defendants for a "Belinda Lucero" regarding a "financial issue." (LaVigne Tr. at 23:3-25).

34.     GC Services called the -4951 number on behalf of the Defendants with the same Aspect dialer used to call the class. (Schordock Tr. at 77:15-21).

35.     The records produced in this matter reflect 'overdraw notification' calls being placed to Plaintiff between April 2, 2014 and August 5, 2015. (Taylor Decl. Ex. E).

36.     Defendants' records also reflect inbound calls (coded '1') *from* Plaintiff to Defendants' vendor at the 888-220-7549 number which were answered by a GC services representative and then coded "Bad/Wrong Number," on May 23, 2014, September 22, 2014, July 21, 2015 and July 23, 2015. (Ex. E; Schordock Tr. at 50:12-51:8; *see also* Tr. 51:9-18 (bad/wrong number designation means there was "an inbound call and somebody's saying it's not them that we're dialing")).

37.     Yet Defendants, through GC Services, continued to call after each inbound call marked 98 (Ex. E), and Plaintiff continued to tell the representatives that they were calling the wrong number:

> *Q.  Whether it was a man or the woman, whenever you said hello or whatever you would say, they would ask for Belinda Lucero, correct?*
>
> *A.  Correct.*
>
> *Q.  I take it your response was what? Tell me what your response was?*
>
> *A.  "No, you have the wrong phone number.  This isn't the phone number for Belinda Lucero."*
>
> *Q.  What would they say next?*
>
> *A.  They would repeat the number back to me and verify that they had called my phone number and I would tell them, "Yes, the number is correct but it doesn't belong to Belinda Lucero."*

(LaVigne Tr. at 24:10-22).

## THE TELEPHONE CONSUMER PROTECTION ACT

"Congress passed the TCPA to protect individual consumers from receiving intrusive and unwanted calls." *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 268 (3d Cir. 2013).  The TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), makes unlawful:

> any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

47 U.S.C. § 227(b)(1)(A)(iii).

"Express consent is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017)*; see also Bray v. PNC Bank, N.A.*, 196 F. Supp. 3d 1282, 1288 (M.D. Fla. 2016); *Hartley-Culp v. Credit Mgmt. Co.*, 2014 WL 4630852, *3 (M.D. Pa., Sept. 15, 2014); *Levy v. Receivables Performance Mgmt., LLC*, 972 F. Supp. 2d 409, 417 (E.D.N.Y. 2013); *Hudson v. Sharp Healthcare*, 2014 WL 2892290, *3 (S.D. Cal., June 25, 2014); *Heinrichs v. Wells Fargo Bank, N.A.*, 2014 WL 985558, *3 (N.D. Cal., March 7, 2014).

## ACA INTERNATIONAL

### I.   ACA International's Impact on ATDS

Since the TCPA's enactment, "the FCC has issued a series of rulemakings and declaratory rulings addressing the Act's reach." *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 693 (D.C. Cir. 2018).

In 2003 the FCC issued an order in which it "concluded that the defining characteristic of an ATDS is 'the capacity to dial numbers without human intervention.'" *Swaney v. Regions Bank*, 2018 WL 2316452, at *1 (N.D. Ala. May 22, 2018) (quoting *In re Rules & Regulations*

*Implementing the Telephone Consumer Protection Act of 1991,* 18 FCC Rcd. 14,014, 14092 (2003) (the "2003 FCC Order")).  The 2003 FCC Order specifically "found that equipment can qualify as an ATDS if it (1) 'store[s] pre-programmed numbers or receive[s] numbers from a computer database'; (2) can 'dial those numbers at random, in sequential order, or from a database of numbers'; and (3) its 'basic function' is 'the *capacity* to dial numbers without human intervention.'" *Zeidel v. A&M (2015) LLC*, 2017 WL 1178150, at *10 (N.D. Ill. Mar. 30, 2017) (quoting 2003 FCC Ruling at 14090–92).

In 2008, the FCC issued another declaratory ruling that "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd. 559, 566 (2008) (the "2008 FCC Order").

In 2015, the FCC issued *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 30 FCC Rcd. 7961 (2015) (the "2015 FCC Order") which addressed the ATDS issue and which was appealed in *ACA International*.  The D.C. Circuit, in reviewing the 2015 FCC Order's treatment of ATDS, identified two questions which arise from the TCPA's definition of ATDS: "(i) when does a device have the 'capacity' to perform the two enumerated functions; and (ii) what precisely are those functions?" *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 695 (D.C. Cir. 2018).

On the first question, the 2015 FCC Order answered with a formulation of capacity which included its "'potential functionalities' or 'future possibility,' not just its 'present ability.'" *Id.* The D.C. Circuit set aside this treatment in *ACA Int'l*.  While the D.C. Circuit found that "capacity" necessarily includes some future functioning state and not present ability (*id*. at 696 ("Virtually any understanding of 'capacity' thus contemplates some future functioning state,

along with some modifying act to bring that state about."), the 2015 formulation had no reasoned limit and had "the apparent effect of embracing any and all smartphones" as they *could* download an app to enable autodialing even if no such download was made. *Id*.  Thus, under *ACA's* reading of the 2015 FCC Order, that order would include a common smartphone as an ATDS whether or not it operated as one.  Because of this reach, the 2015 FCC Order's definition of capacity was "untenable." *Id*. at 689; *see Reyes v. BCA Fin. Servs., Inc.*, 312 F. Supp. 3d 1308, 1317 (S.D. Fla. 2018).

On the second question (the functions), the D.C. Circuit found that the 2015 FCC Order's answer was at cross purposes with itself.  As the court in *Reyes* explained:

> After its review, the D.C. Circuit concluded that the 2015 FCC order "falls short of reasoned decisionmaking in 'offer[ing] no meaningful guidance' to affected parties" because it chose differing, contrary interpretations or no interpretations at all as to ATDS functionality. *Id*. For instance, on the question of "whether a device must itself have the ability to generate random or sequential telephone numbers to be dialed" or can simply "call from a database of telephone numbers generated elsewhere," the FCC was "of two minds on the issue." *Id*. at 701.

> Specifically, the D.C. Circuit explained that "[w]hile the 2015 ruling indicates in certain places that a device must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer, it also suggests a competing view: that equipment can meet the statutory definition even if it lacks that capacity." *Id*. at 702. On that issue, the FCC reaffirmed its 2003 order, in which it had "made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS." *Id*. at 702.

> The D.C. Circuit did not reject one view or the other. Rather, it recognized that *either* interpretation might be permissible but disapproved the FCC's Janus-like approach.

*Reyes*, 312 F. Supp. 3d at 1318.  It was that specific conflicting ruling in the 2015 FCC Order which made <u>it</u>, that specific ruling, fail to satisfy reasoned decision making.

Following *ACA*, the majority of Courts to address the issue have found that *ACA* was limited to the 2015 Order and did not reach back and overturn the FCC's 2003 and 2008 Orders.

*See, e.g., Pieterson v. Wells Fargo Bank, N.A.*, 2018 WL 3241069, at *3 (N.D. Cal. July 2, 2018) ("As several other courts have recently observed, *ACA Int'l* vacated the 2015 Declaratory Ruling but it did not clearly intend to disturb the FCC's 2003 and 2008 orders.").[1]

## II.   *ACA International's* Impact on Wrong Number Calls

Aside from not substantively altering the definition of an ATDS, the D.C. Circuit's decision in *ACA* likewise did not change existing law that a caller needs the prior express consent of the called party, rather than the intended recipient, under the TCPA.  Nor did it provide any exceptions for reassigned numbers or a caller's reliance on a prior representation regarding the owner of a number.

First, the court in *ACA Int'l* found that the 2015 FCC Order's interpretation of the term "called party" to mean the person actually called, rather than the intended recipient of a call, to be correct. *ACA Int'l*, 885 F.3d at 706 ("The Commission thus could permissibly interpret 'called party' . . . to refer to the current subscriber.").  In addition, the court rejected a limited one-call safe harbor created by the FCC in the 2015 FCC Order to deal with the issue of reassigned numbers (when a number is assigned to a new person and the chain of consent is broken). *ACA Int'l*, 885 F.3d at 706-09.  The court found the one-call safe harbor to be arbitrary. *Id*.

Thus, the D.C. Circuit "set[ ] aside not only [the FCC's] allowance of a one-call safe harbor, but also its treatment of reassigned numbers more generally," including the 2015 FCC Order's interpretation of the term "called party." *Id*., 885 F.3d at 708.  It did so because it saw

---

[1] *See also, e.g., Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578 (M.D. Tenn. 2018) ("In the wake of *ACA International*, this Court joins the growing number of other courts that continue to rely on the interpretation of § 227(a)(1) set forth in prior FCC rulings."); *Swaney v. Regions Bank*, 2018 WL 2316452, at *1-2 (N.D. Ala. May 22, 2018); *O'Shea v. Am. Solar Sol., Inc.*, 2018 WL 3217735, at *2 (S.D. Cal. July 2, 2018); *McMillion v. Rash Curtis & Assocs.*, 2018 WL 3023449, at *3 (N.D. Cal. June 18, 2018); *Maddox v. CBE Group, Inc.*, 2018 WL 2327037, at *4 (N.D. Ga. May 22, 2018).

the two FCC rulings as interrelated and could not say "without any substantial doubt" that the FCC would have made the first permissible "called party" interpretation if it knew that its second safe harbor rule would not stand. *Id.*  After "set[ting] aside the Commission's treatment of reassigned numbers as a whole," the D.C. Circuit noted that the FCC "is already on its way to designing a regime to avoid the problems of the 2015 ruling's one-call safe harbor." *Id.,* 885 F.3d at 709.  However, the FCC has not released any new regulations regarding reassigned numbers since *ACA*.  *See Pieterson v. Wells Fargo Bank, N.A.,* 2018 WL 3241069, at *4 (N.D. Cal. July 2, 2018) ("while the FCC's notice sought comment on whether it should adopt a safe harbor for callers who use 'reassigned number solutions that are in the marketplace today,' the notice does not state that the FCC intends to craft such a safe harbor or implement one in the future.").

Accordingly, with the 2015 FCC Order's treatment of "called party" set aside, we revert to the pre-2015 FCC Order jurisprudence which was squarely on the side of the term "called party" meaning the person actually called.  *See Pieterson*, 2018 WL 3241069, at *3 ("Even if [ACA] had vacated the FCC's earlier orders, the D.C. Circuit's ruling does not overrule Ninth Circuit precedent that bears on the question of what constitutes an ATDS . . . . Further, while the Ninth Circuit has not spoken directly on the issue of reassigned numbers, other circuits have held that a 'called party' is the person who receives the call, not the person a debt collector was intending to reach.") (quoting *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 641 (7th Cir. 2012)); *see also, e.g., Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1251-52 (11th Cir. 2014); *Warnick v. Dish Network LLC*, 2014 WL 12537066, at *16 (D. Colo. Sept. 30, 2014); *Sterling v. Mercantile Adjustment Bureau, LLC.*, 2014 WL 1224604, at *3 (W.D.N.Y. Mar. 25, 2014).  Likewise, because *ACA* set aside the one-call safe harbor for reassigned numbers in the 2015 FCC Order, there is currently *no* safe harbor for when an autodialer calls the wrong party.

14

**ARGUMENT**

## I.   LEGAL STANDARD

Under Rule 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under Rule 56(c), "the moving party bears the initial burden of presenting evidence to show the absence of a genuine issue of material fact," and satisfies that burden by showing beyond a reasonable doubt that she is entitled to summary judgment. *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).  "Once the movant has made a showing that there is no genuine issue of material fact, the non-moving party may not rest upon the mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Hom v. Squire*, 81 F.3d 969, 973 (10th Cir. 1996) (internal citations and quotation marks omitted).  Indeed, "[t]o avoid summary judgment, the non-moving party must present more than a mere scintilla of evidence." *Id.*  Rather, the "non-moving party must show that there is a genuine issue for trial, a showing which requires 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Id.*, 81 F.3d at 974 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986)). "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).  Nor is "[t]he mere possibility that a factual dispute may exist, without more," sufficient to oppose summary judgment. *Id.*

## II.   PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT

### A.  DEFENDANT USED AN AUTOMATIC TELEPHONE DIALING SYSTEM TO CALL PLAINTIFF'S CELLULAR TELEPHONE

The Aspect dialer stored Plaintiff and class telephone numbers and then automatically dialed those numbers without any human intervention, and thus constitutes an ATDS (1) under the still-valid 2003 and 2008 FCC Orders and (2) under the statutory definition of an ATDS itself.

### 1.  The Aspect dialer is an ATDS under the 2003 and 2008 FCC Orders

As set forth above, the portions of the FCC's 2003 and 2008 addressing the definition of an ATDS, and the fact that a predictive dialer falls within the definition of an ATDS, are still good law. *See, e.g., Swaney*, 2018 WL 2316452, at *1-2 ("[i]n its 2003 Order, the FCC concluded that the defining characteristic of an ATDS is 'the capacity to dial numbers without human intervention'" and that "[i]n light of *ACA International*, that proposition still stands.") (internal citation omitted).  Under the 2003 FCC Order, equipment that (1) stores numbers or receives them from a computer database; (2) can dial them at random, in sequential order, or from a database; and (3) has the capacity to dial those numbers without human intervention, is an ATDS. *Zeidel*, 2017 WL 1178150, at *10; *see also Morse v. Allied Interstate, LLC*, 65 F. Supp. 3d 407, 410 (M.D. Pa. 2014).  For this reason, courts have consistently held that predictive dialers, including the Aspect predictive dialer used in this case, constitute ATDS. *See, e.g., Espejo v. Santander Consumer USA, Inc.*, 2016 WL 6037625, at *4 (N.D. Ill. Oct. 14, 2016) ("there is no dispute that Santander's Aspect 'dialer' functions as a 'predictive dialer,' which the Federal Communications Commission has ruled constitutes an ATDS for purposes of the TCPA, regardless of whether it uses 'a random or sequential number generator' as recited in the TCPA."); *Manuel v. NRA Grp., LLC*, 200 F. Supp. 3d 495, 502 (M.D. Pa. 2016), *aff'd,* 722 F.

App'x 141 (3d Cir. 2018) (predictive dialer constituted an ATDS as a matter of law); *Davis v. Diversified Consultants, Inc.*, 36 F. Supp. 3d 217, 226 (D. Mass. 2014) ("Here, Pye testified that the LiveVox system was a predictive dialer. The LiveVox memorandum and defendant's own website likewise stated that the LiveVox system was a predictive dialer. In short, the LiveVox system, as utilized by defendant, was an ATDS."); *see also Sterk v. Path, Inc.*, 46 F. Supp. 3d 813, 819 (N.D. Ill. 2014) ("The undisputed facts show that the equipment used by Path, which makes calls from a stored list without human intervention is comparable to the predictive dialers that have been found by the FCC to constitute an ATDS.").  The Aspect dialer, which is a predictive dialer that stores numbers and then calls them automatically, fits well within the definition of an ATDS under the 2003 and 2008 FCC Orders.

First, the Aspect system stores telephone numbers: the Bank sends GC Services a "listing of accounts" which gets "loaded automatically" into the Aspect system, (Schordock Tr. at 9:2-4), and then stored in the dialer for dialing the following day. (Schordock Tr. at 10:23-11:4).  This process is done electronically and automatically. (Schordock Tr. at 99:1-7).

Second, the Aspect system dials those stored numbers automatically, without any human intervention.  Every day, the Aspect dialer dials through the previously-loaded list of numbers, and the dialer – rather than a human being – dials those numbers:

> A.    We get, you know, a listing of accounts every night from the client.  They get loaded automatically to a predictive dialing system. Agents are then on the phone, the dialer dials.

(Schordock Tr. at 9:2-23). The dialer chooses what numbers to dial and when, based on its automated organization of the accounts into "campaigns" and criteria such as the balance of a customer's bank account or the "number of days overdrawn." (Schordock Tr. at 100:1-101:2). In addition, the dialer is pre-programmed to treat all accounts within a given campaign the same,

and thus can and does dial the numbers based on entirely pre-programmed logic with no human involvement. (Schordock Tr. at 22:16-21). The dialer can determine, on its own, whether the recipient of a call answers the phone or not. (Schordock Tr. at 12:10-23). Further, the dialer determines what to do with the call once it assesses whether the call was answered; if the dialer determines that someone answers the call, it "will pass [the call] to an agent that's available," but if the dialer determines the number is disconnected, the dialer will not send the call to an agent. (Schordock Tr. at 13:3-7).

In short, (1) the dialer chooses what telephone numbers to call and the order in which it will dial those numbers; (2) the dialer dials the number; (3) the dialer assesses whether the call was answered or not; and (4) only after performing the aforementioned acts, the dialer transfers the call to a live representation *if* it determines someone answered. Because the predictive dialer automatically calls lists of stored numbers without human intervention, it is an ATDS. *See Reyes*, 312 F. Supp. 3d at 1322 (finding, post-*ACA Int'l,* that a predictive dialer that automatically dialed stored list of numbers without human intervention, is an ATDS as a matter of law); *Swaney*, 2018 WL 2316452, at *1-2 (finding post-*ACA Int'l* that plaintiff was entitled to summary judgment on whether the defendant's system was an ATDS because the "Plaintiff presented sufficient evidence to demonstrate that the system at issue has the capacity to dial numbers (i.e., send text messages) without human intervention."); *Ammons*, 326 F. Supp. 3d 578 (post-*ACA Int'l* court found "as a matter of law that the stipulated predictive dialer used by [defendant] is an ATDS under § 227(a)(1) and the 2003 FCC Ruling.); *Manuel*, 200 F. Supp. 3d at 502 ("there is no genuine issue regarding whether Mercury Dialer is capable of placing calls without human intervention; hence, Mercury Dialer constitutes an automatic telephone dialing

system. Manuel is entitled to judgment as a matter of law pursuant to the Telephone Consumer Protection Act claim.").

### 2. The Aspect dialer is an ATDS under the statutory language as set forth in *Heard* and *Somogyi*

Aside from satisfying the definition of an ATDS under the 2003 and 2008 FCC Orders, the Aspect dialer constitutes an ATDS pursuant to the statutory definition itself. *See Heard,* 2018 WL 4028116, at *6 (holding a predictive dialer sequentially calls under the plain meaning of the TCPA).

The TCPA defines an ATDS as "equipment which has the capacity":

(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

(B) to dial such numbers.

47 U.S.C. § 227(a)(1).

Here, the Aspect dialer stores telephone numbers to be dialed the following day (Schordock Tr. at 9:2-18, 10:23-11:4, 99:1-7; Pelache Tr. at 10:16-11:2).   Then, using an "algorithm" (Schordock Tr. 11:5-19) and "parameters set for it," (*id.* at Tr. 12:5-9), the Aspect dialer, on its own, generates numbers in a *sequence* for dialing based on, when Defendants could "start calling within [a given] time zone[ ]" and a bank account's "balance or number of days overdrawn," (*id.* at 99:24-100:4).   Once the dialer sequences the numbers, "the dialer dials" and it is only when a call is answered that the system routes the call to a live GC Services' agent; calls that are not answered are terminated by the Aspect dialer without any live person at GC Services being involved.   (Schordock Tr. at 9:2-23; 12:20-13:6).   The sequence can even be "flipped" the next day to ensure Defendants are "saturating" the list.  (*Id.* at 100:1-6).

This is exactly how the ATDS in *Heard v. Nationstar Mortgage* functioned.  There the system stored numbers when, each day, defendant's "employees input the necessary call data from the company's loan files" into its dialing system. *Heard*, 2018 WL 4028116, at *4.  The system then generated sequential numbers to be called where it "produces from the inputted call data a list of numbers that the iAssist software sequences according to a borrower's predicted availability to receive calls" and "then dials the numbers as sequenced and connects the call to a Nationstar representative." *Id.,* at *5-6.  That the system dialed from a "predetermined list of telephone numbers" did not alter the court's holding that the system was an ATDS as a matter of law.  2018 WL 4028116, at *6.  This was so, because, once telephone numbers were uploaded into the predictive dialer in *Heard*, the dialer "sequence[d]" numbers to be dialed based on parameters set by the user such as whether the recipient will answer the call. *Id.*  Nor did it matter that one of defendant's employees must log into the dialer before the system started dialing, because that did "not detract from the fact that the representative does not choose whom to call or dial the outgoing calls," as those decisions were instead made by the dialer. *Id.* ("To hold that a system is not an automatic dialer whenever an employee examines and transfers information from an external database onto the dialing system would unnecessarily limit the TCPA's application.").

So too here the Aspect dialer (1) stores telephone numbers to be dialed the following day (Schordock Tr. at 9:2-18, 10:23-11:4, 99:1-7; Pelache Tr. at 10:16-11:2) and (2) produces from the list of stored number a sequence of numbers to be dialed based on an "algorithm and "parameters," including when Defendants could dial numbers in a given time zone, a bank account's "balance or number of days overdrawn" (Schordock Tr. at   99:24-100:4).   The sequence can even be "flipped" to ensure maximum effectiveness.  (*Id.* at 100:3).  The Aspect

dialer then dials the numbers as sequenced and only routes a call to a live GC Services' agent if it detects someone answered the call.  (Schordock Tr. at 9:2-23; 12:20-13:6).  This is nearly identical to the system described in *Heard.*

Similarly, in *Somogyi v. Freedom Mortg. Corp.* the plaintiffs alleged that defendant's dialing system "'effectively acted like a random number dialer[ ]'" in that the system, rather than a human, would "choose a telephone number to be called, put information on the caller's screen such as the name and address of the individual being called, and dial the ten digit number without further human intervention"; "[t]he software, not the caller, decided who would be called next." *Somogyi v. Freedom Mortg. Corp.,* 2018 WL 3656158, at *2 (D.N.J. Aug. 2, 2018).  In holding these allegations sufficient to show it generated numbers randomly, the court found that "[i]f, as Plaintiffs allege, FMC's system selected the next number from among a population of hundreds of thousands of numbers belonging to existing customers, the selection of the next call is what matters, and it is random." *Id.,* at *7.  It explained that a "calling system is no less random if the machine's universe is the hundreds of thousands of customers, or the residents of a state, or the residents of a nation" because otherwise "a system containing fewer than all the telephones in the world is a pre-selected, limited universe, and therefore not 'random.'" *Id.*  So too here, the Aspect dialer rather than a live employee chooses which number to dial by determining the sequence and then dials that number without any human intervention, (Schordock Tr. at 9:2-23).  That the universe of numbers is limited to only those loaded into the system (rather than every number in the universe) is of no moment as it does not make the dialer's generation of the number to dial the next number any less sequential. *See Somogyi*, 2018 WL 3656158, at *7.  As the Court in *Somogyi* explained, the key is number selection and whether it is random or sequential by the dialer.

Thus, even if this Court were to join the minority of Courts holding that the 2003 and 2008 Orders are no longer valid, the Aspect dialer is an ATDS because it stores numbers and generates numbers in a sequence for dialing. Therefore, the Aspect dialer is an ATDS because it stores or produces numbers to be called, using a sequential or random number generator, and then dials such numbers.

### 3. The Aspect dialer is an ATDS under the statutory language as set forth in *Marks*

Aside from satisfying the definition of an ATDS under the plain language of the statute as set forth in *Heard* and *Somogyi,* the Aspect predictive dialer additionally satisfies the statutory definition of an ATDS as explained in the Ninth Circuit's post-*ACA International* decision in *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018).

In *Marks*, the Ninth Circuit held that the "statutory definition of ATDS includes a device that stores telephone numbers to be called, whether or not those numbers have been generated by a random or sequential number generator." *Marks*, 904 F.3d 1041; *see also Adams v. Ocwen Loan Servicing, LLC,* No. 18-81028 (S.D. Fla., Oct. 29, 2018) (ECF No. 23 at p. 6) ("Upon the Court's independent review of the relevant case law, the Court agrees with the reasoning and conclusions of post-*ACA* decisions which hold that 'the statutory definition of ATDS includes a device that stores telephone numbers to be called, whether or not those numbers have been generated by a random or sequential number generator.'").

The *Marks* court preliminarily found that in *ACA Int'l,* the D.C. Circuit did set aside all prior FCC Orders regarding "what sort of device qualified as an ATDS," and thus "only the statutory definition of ATDS as set forth by Congress in 1991 remains." *Id.* at *7. It then concluded that the statutory text was ambiguous on its face and looked to the context and structure of the statutory scheme to determine the necessary functions of an ATDS. *Id.,* at *8.

The context and structure of the statutory scheme shows that generating numbers from whole cloth is not a required function of an ATDS.  The court first explained that to take advantage of certain portions of the TCPA allowing ATDS calls to selected numbers, such as to individuals who have given prior express consent and individuals who owe a debt to the United States, a dialer would have to dial from a list of phone numbers of persons who had consented to such calls, or a list of individuals who owed debts to the U.S. government, "rather than merely dialing a block of random or sequential numbers." *Marks* at *8.  It also found that when Congress amended the TCPA in 2015 under the Bipartisan Budget Act of 2015, it "left the definition of ATDS untouched, even though the FCC's prior orders interpreted this definition to include devices that could dial numbers from a stored list" and by doing so, "Congress gave the interpretation [set forth in prior FCC Orders] its tacit approval." *Id.*  After reviewing this context, the Court held that "equipment that made automatic calls from lists of recipients was also covered by the TCPA." *Id.*  Accordingly, "the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a 'random or sequential number generator,' but also includes devices with the capacity to dial stored numbers automatically. " *Id. at *9*

Here, it is undisputed that the Aspect dialer stored lists of uploaded telephone numbers, and then dialed those numbers automatically without human intervention, and thus the dialer fits neatly within the ATDS definition set forth in *Marks.*  Accordingly, *even if* the Aspect dialer could not randomly or sequentially generate numbers (it can), it nonetheless is still an ATDS under the language of the statute because it can store numbers and then automatically dial the stored numbers without human intervention. *See id; Adams v. Ocwen Loan Servicing, LLC,* No. 18-81028 (S.D. Fla., Oct. 29, 2018).

### 4.  Defendant's interpretation of an ATDS is incorrect and would lead to absurd results

In their motion for leave to file a motion for summary judgment, Defendants assert they "did not use a random or sequential dialer prohibited by the TCPA" because Defendants' vendor "us[ed] a dialer loaded with only externally supplied phone numbers . . . ." (Doc. No. 141 at p. 4).  Defendants are essentially arguing that, to be an ATDS under the TCPA, sequential and random number generation requires that the system must generate new numbers sequentially or randomly from whole cloth.  This is a maximalist and absurd interpretation of the TCPA.

The TCPA was not passed to deal with absurdities.  There are 9,999,999,999 possible telephone numbers using the ###-###-#### telephone number format.[2]  Thus, to be an ATDS under Defendants' interpretation of the statute, a system would have to dial sequentially through that list of ten billion phone numbers or randomly generate numbers within that set.  Nobody is, or ever was, calling ten million or ten billion numbers created with a random or sequential generator; interpreting the definition of ATDS to require the system function this way would be absurd. *See Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006) ("When statutory language reasonably admits of alternative constructions, there is nothing remarkable about resolving the textual ambiguity against the alternative meaning that produces a result the framers are highly unlikely to have intended. We choose the reasonable result over the 'absurd' one."); *Armijo v. FedEx Ground Package Sys., Inc.*, 285 F. Supp. 3d 1209, 1214 (D.N.M. 2018) ("If the strict wording of the law suggests an absurd result, [courts] may interpret the statute to avoid such a result.") (internal citations and quotation marks omitted).

Instead, ATDS and dialers have *parameters* which limit the universe of numbers to be dialed to correspond with the aims of the entities using the dialer.   And, as soon as some

---

[2] There are 9,999,999 possible numbers if the area code is excluded (###-####).

limitation is placed on the universe of telephone numbers to be called (whether by area code, by time zone, by defining a list (e.g. call each number between 505-348-2000 to 505-348-3000) or by supplying it with a list), the system is dialing a preset and predetermined list and *is not* creating numbers. Thus, as the Court's in *Somogyi* held, random or sequential number generator does not go to the creation of a number but to their automatic *selection*. If this was not the case, "a system containing fewer than all the telephones in the world is a pre-selected, limited universe, and therefore not 'random'" but "Congress could not intend such an absurd result." *Somogyi*, 2018 WL 3656158, at *7. Defendants' interpretation of sequential and random number generating leads to such absurd results and must be rejected.

For each of the foregoing reasons, the Aspect dialer that Defendants' used to call Plaintiff and the certified class is an ATDS under the TCPA as a matter of law and summary judgment should enter in Plaintiff's favor.

## B. SUMMARY JUDGMENT SHOULD ENTER ON DEFENDANTS' PRIOR EXPRESS CONSENT DEFENSE

Prior express consent is "an affirmative defense for which the defendant bears the burden of proof," *Van Patten*, 847 F.3d at 1044, and there is no evidence in this case showing that Defendants had prior express consent to call either Plaintiff or any class member.

First, prior express consent must come from the called party, not the intended recipient of a call. *See Osorio*, 746 F.3d at 1251-52; *Warnick*, 2014 WL 12537066, at *16; *Sterling*, 2014 WL 1224604, at *3. Thus, Defendants must have prior express consent from the individuals they actually called, not the person they meant to call. But Defendants do not have consent from Plaintiff, who is not a customer of the Defendants, to place automated calls to her cellular telephone regarding someone else's bank overdraft. Nor do Defendants have the prior express consent from members of the class – all of whom are not customers of the Defendants (*see* Doc.

No. 123 at p. 18 ("Excluded [from the class] are customers of First National Bank Texas or First Community Bancshares, Inc.")) – to place bank overdraft calls regarding someone else's bank account.

Second, aside from the fact that Defendants never had consent to call Plaintiff or the class, Defendants were put on notice by Plaintiff and the class that they were calling the wrong number. Defendants, as a matter of policy, ignored these warnings and persisted in calling Plaintiff and class members after being advised that they had called the wrong number. (Ex. E; LaVigne Tr. at 24:10-22 (testifying that during each call she answered, Plaintiff advised Defendants' vendor it was calling the wrong number); Schordock Tr. at 49:22-51:18 (incoming call marked "Bad/Wrong Number" signifies that a consumer (1) received a call from the 888-220-7549 number, (2) called back that number, and (3) told the representative "you're calling the wrong number.") & 28:4-16 (GC Services reports the outcome of all calls, including the "Bad/Wrong Number" calls, back to the Bank "[e]very night.").

Defendants have indicated they believe they are not liable for these calls because in the past they may have had consent to call the numbers when they, perhaps, belonged to a prior owner. (Doc. No. 141 at pp. 4-5). This argument fails; there is no "intended recipient" exception for the prior express consent requirement and certainly not where the Defendants were *told* they are calling the wrong number. *See Soppet*, 679 F.3d at 641; *Osorio*, 746 F.3d at 1251-52.

Defendants may claim that *ACA* created some "reasonable reliance" exception. It did not; while the FCC had previously established a one-call safe harbor in the 2015 FCC Order, that safe harbor was *vacated* in *ACA Int'l*, 885 F.3d at 706-09 ("we must set aside the Commission's treatment of reassigned numbers as a whole."). Following *ACA Int'l,* there are no exceptions or safe harbors for callers calling reassigned numbers. *See Pieterson,* 2018 WL 3241069, at *4.

Moreover, even if there was an exception for instances where a caller has not yet "determine[d] the called number is no longer associated with a prior consenting party," that would not apply to Defendants where they called *after* being put on notice of calling the wrong party. (*See* Schordock Tr. at 49:22-51:18 (an incoming call marked "Bad/Wrong Number" signifies that a consumer (1) received a call from the 888-220-7549 number, (2) called back that number, and (3) told the representative "you're calling the wrong number" or "somebody's saying it's not them that we're dialing.").

The evidence in this case establishes that Defendants had a policy of systematically ignoring notices that they were calling wrong numbers. Rather than cease calling these wrong numbers, or indeed do anything at all to even address the issue, Defendants continued to instruct their vendor to call those non-customers who asked Defendants to stop. There is no issue of material fact that Defendants lacked prior express consent to call Plaintiff or class members and summary judgment should enter for Plaintiff and the class on Defendants' affirmative defense of prior express consent.

## CONCLUSION

The undisputed evidence in this case shows that Defendants' vendor used an ATDS to call Plaintiff and the class members' cellular telephones on Defendants' behalves. The evidence additionally shows that Defendants called the Plaintiff and each class members without prior express consent. This is sufficient to show that Defendants violated the TCPA. Accordingly, Plaintiff respectfully requests that the Court grant Plaintiff's Motion for Summary Judgment and find that Defendants are liable to Plaintiff and the Class under the TCPA.

Dated: October 31, 2018

By:      */s/ Stephen Taylor*
         Stephen Taylor
         Lemberg Law, LLC
         *Counsel to Plaintiff and the Class*
         43 Danbury Road
         Wilton, CT 06897
         T.(203) 653-2250 ext.5502
         F.(203) 653-3424

## <u>CERTIFICATE OF SERVICE</u>

**THIS IS TO CERTIFY** that on October 31, 2018, a copy of the foregoing was filed with the clerk of the Court through the CM/ECF system which sent notice of such filing to the following:

Mark Glenn
Moses, Dunn, Farmer & Tuthill, P.C.
P.O. Box 27047
Albuquerque, New Mexico 87125

William S. Helfand
LEWIS BRISBOIS BISGAARD &SMITH, LLP
24 Greenway Plaza, Suite 1400
Houston, Texas 77046

            */s/ Stephen Taylor*
            Stephen Taylor