IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Janine LaVigne, on behalf of herself and all
others similarly situated,

Plaintiff,

v.

First Community Bancshares, Inc.; First
Community Bank; DOES 1-10, inclusive,

Defendants.

Civil Action No. 1:15-cv-00934-WJ-LF

### DEFENDANTS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendants, First Community Bancshares, Inc. and First National Bank Texas (collectively, the "Bank"), submit this consolidated motion for summary judgment and response in opposition to Plaintiff's motion for partial summary judgment on Plaintiff's claims under the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.*

Following the D.C. Circuit's opinion in *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018), there is no genuine issue of material fact supporting Plaintiff's allegation the Bank called Plaintiff's cellphone using an automatic telephone dialing system. Moreover, the evidence disproves Plaintiff's assertion that the Bank's agent's calls to class members are all in violation of the TCPA. Thus, as explained *infra*, the Bank is entitled to summary judgment on all of Plaintiff's claims under the TCPA. Alternatively, the law and evidence show the class is not entitled to summary judgment on the issue of liability.

Further, and in the alternative, under the D.C. Circuit's controlling authority in *ACA*, the Bank cannot be liable for calls made to phone numbers from which the Bank previously received a

bank customer's consent to call up to and until the Bank affirmatively determined the called number was no longer associated with the prior consenting party.

## INTRODUCTION

In 1991, Congress enacted the Telephone Consumer Protection Act to address the use of automatic dialing systems capable of generating and dialing random and sequential numbers. The TCPA prohibits "using any automatic telephone dialing system" to call emergency-service numbers, hospital rooms, cellphones, and other specialized lines. 47 U.S.C. § 227(b)(1)(A). The TCPA defines an automatic telephone dialing system as "equipment which has the capacity — (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.*, at § 227(a)(1). The Federal Communications Commission originally interpreted the statute accordingly in its 1992 and 1995 Orders.

However, in 2003, and again in 2008 and 2015, the FCC expanded the statutory definition of an ATDS to cover various kinds of dialing equipment the statute's language simply did not cover, but the Commission nonetheless believed was undesirable. For example, the FCC's 2003, 2008, and 2015 Orders prohibited predictive dialers, devices which use a complex set of algorithms to automatically dial telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. Courts across the country had little choice but to accept the Commission's interpretation because the only way to challenge the validity of one of the Commission's orders is to petition a circuit court for review.

Addressing just such a petition for review in *ACA Int'l v. FCC*, the D.C. Circuit set aside the FCC's impermissibly and unreasonably expansive interpretation of ATDS the Commission had endorsed since 2003. Thus, in the enforcement of the TCPA's private right of action, the *ACA* opinion takes courts back to the legal regime set up by the plain text of the statute and the

Commission's pre-2003 orders. Under that regime, a device qualifies as an ATDS only if the device has the present capacity to generate and dial random or sequential telephone numbers.

Further, the *ACA* court addressed instances similar to the facts in the case at bar, where caller obtains a party's consent and the consenting party's wireless number may be reassigned to a different person who has not provided consent.[1] Under its 2015 Order, the FCC said that, in cases where a number has a changed, a caller enjoys a one-time safe-harbor for making an uninvited call to the previously consensual number. The *ACA* court inquired whether the Agency's rule regarding the one-time safe harbor in such cases was sustainable, concluding that it was, rather, "arbitrary and capricious." *ACA*, 885 F.3d at 691, 705.  Because the FCC could have adopted a strict liability approach, but explicitly rejected it, the Court evaluated the rule in the context of the Commission's own "reasonable reliance" standard and  held that the *ACA* court could see no clear rationale why, under that standard, a caller's reasonable reliance would "necessarily cease to be reasonable once there has been a single, post-reassignment call." *Id.*, at 707.

In the instant lawsuit, Plaintiff sued the Bank under the TCPA alleging the Bank, through its vendor, GC Services Limited Partnership, called Plaintiff's cellphone and the cellphones of potential class members without their consent using an ATDS. However, the undisputed evidence demonstrates the Bank, through GC Services, used only the Aspect Unified IP system, a dialer which lacked the present capacity to generate or dial random or sequential telephone numbers. Thus, under the plain text of the TCPA, the Aspect System is not an ATDS as a matter of law and Plaintiff's TCPA claims fail on this dispositive point.

---

[1] In the case at bar, class counsel has presented no evidence that any cell phone number, including the class representative's cell phone number was reassigned.

Further, the undisputed evidence shows the Bank, through GC Services, only called bank customers about their own existing accounts, using only numbers customers themselves provided to the Bank. Each customer consented in writing to be called on a cellphone, even by an automatic dialer. The Bank made calls only as a courtesy to let its own consenting customers know their accounts were overdrawn. Because the Bank only called its own customers, each of whom had provided their phone numbers and express consent to such a call, the undisputed evidence is the Bank did not attempt to contact anyone without their consent at any time, no number was randomly generated or randomly dialed, and, contrary to Plaintiff's unsupported conclusory statement, the Bank did not call anyone it actually knew was not a Bank customer (indeed, it had not reason to do so).

## **EVIDENCE**

The Bank's motion is supported by the following evidence, which establishes facts that may not be apparent from the record. The Bank incorporates this evidence through this reference:

**Exhibit 1:**   **Deposition of the Bank's Corporate Representative, March 24, 2016;**

**Exhibit 2:**   **Declaration of the Bank's Corporate Representative, November 13, 2018;**

**Exhibit 3:**   **Signature Card, dated October 4, 2013, FNBT 017 – FNBT 018;**

**Exhibit 4:**   **Deposition of Plaintiff Janine LaVigne, February 23, 2016;**

**Exhibit 5:**   **Deposition of GC Services' Corporate Representative, November 6, 2016;**

**Exhibit 6:**   **Declaration of GC Services' Corporate Representative, November 14, 2018; and**

**Exhibit 7:**   **Declaration of GC Services' Corporate Representative, November 7, 2017.**

## FACTS

a.     **The Bank's Courtesy Calling Program**

Defendant First National Bank Texas is a retail bank with locations throughout Texas, Arizona, and New Mexico, and a wholly owned subsidiary of Defendant First Community Bancshares, Inc. Ex. 1, 23:9-23:12. Every bank customer who opens an account with the Bank consents in writing to receive, at any of the phone numbers the customer chooses to provide, including cellphone numbers, phone calls from the Bank placed in any manner, including by an automatic dialer as well and to the use of artificial or prerecorded messages. *Id.*, 86:14-86:16; Ex. 2, at ¶ 2.

It is undisputed that, on October 4, 2013, one of the Bank's customers, who is not Plaintiff, provided the Bank with that customer's phone number with a New Mexico area code, (505) xxx-4951 – the phone number at issue in this case. Ex. 3. Plaintiff acquired the (505) xxx-4951 phone number in March 2014. Ex. 4, 8:12-8:18. Thus, Plaintiff's cell phone number, (505) xxx-4951, was in the Bank's database as that of a Bank customer.

The Bank contracted with non-party GC Services for GC Services to place courtesy calls to the Bank's customers whose accounts were overdrawn by at least $25 to inform the Bank's customers of their overdrawn status. Ex. 1, 12:20-13:7; 23:18-24:7; Ex. 2, at ¶ 3. To complete these calls, GC Services exclusively used the Aspect Unified IP system. Ex. 5, 9:24-10:5. As set forth in the declaration of GC Services' corporate representative, the Aspect System calls telephone numbers from a set list containing the Bank's customers' contact information. Ex. 6, at ¶ 8. The Aspect System cannot or generate and dial random or sequential telephone numbers. *Id.*, at ¶ 9. Once a dialed call is picked up, the Aspect System forwards the call to a human agent with whom the called party will speak. *Id.*, at ¶ 7; Ex. 5, 12:24-13:6.

GC Services does not leave a message if no one answers the phone when GC Services places a courtesy calls to a Bank customer. Exhibit 5, 53:20-53:23. In such a situation, and regardless of whether GC Services' call was to a cellphone or a landline, a return call to GC Services from the unanswered phone number often results because the Bank's phone number is displayed on the called person's caller ID, and many who call say they are doing so because they saw the call to them on their caller ID. *Id.*, 53:24-54:4.

GC Services maintains a call log showing various characteristics of each incoming call to the Bank's phone number displayed on a called person's caller ID. *Id.*, 20:1-20:9; 22:25-25:5. GC Services also maintains a call log of each outbound call it placed to overdrawn customers of the Bank to inform them of their overdrawn status. *Id.* These call logs list, among other things, the inbound phone number from which a person called in for an inbound call, the outbound phone number called by GC Services for an outbound call, the date and time the call started and ended, the length of the call, and the GC Services' operator's discretionary tag for disposition of the call. *Id.*

When coded by a human operator, as opposed to the Aspect System, one of the substantive call disposition reference codes available to GC Services' operators is "98." *Id.*, 45:21-46:2. This code has an internal shorthand name of "Bad/Wrong Number" but, as the undisputed evidence shows, that code number does not mean GC Services made a call out to, or received a call from, a non-bank customer. *Id.*, 45:21-46:2; 114:8-114:18; Ex. 7, at ¶ 2. Rather, and as the undisputed evidence shows, Code "98" is a catch-all, used for a variety of reasons, including when there is no communication with a person at all. *Id.* According to GC Services' corporate representative, there are "a lot of different things that get lumped into that [code]." Ex. 5, 26:2-26:8.

One of the most prevalent reasons GC Services might code a call as 98 would be based on GC Services' inability to identify which Bank customer is calling in. Ex. 6, at ¶ 6. When GC

Services receives an inbound call routed to the phone number for the Bank, which is also the number someone GC Services had called on behalf of the Bank would see on their caller ID, GC Services answers the phone using the Bank's name. *Id.*, at ¶ 7. Many people, who are likely calling just to ask who had called them, hang up with little or no discussion once they hear the operator say "First National Bank Texas," as they then know who called them. *Id.* A GC Services operator who answers an inbound call to the Bank from any caller who chooses to engage the operator about why they had received a call from the Bank, or for any other reason, will not discuss bank account or other information until the caller provides enough information to locate their account. *Id.*, at ¶ 7. As GC Services attempts to identify inbound callers as the Bank's customers, many callers end the call somewhere in the process because they are satisfied with the information they have already obtained from calling in and/or the customer chooses not to provide the personal identifying information GC Services' operators are required to obtain to locate that the Bank's customer's individual account information, which they must do before they engage in any substantive conversation with a caller, including a conversation about whether the caller would prefer the Bank not call the customer upon that number for some reason. *Id.*, at ¶ 8. Any of these calls, which are to or from customers, even though not ultimately identified, may result in the code "98" designation, even though the person is likely the Bank's customer, since that is the only way GC Services would have called the number in the first place, and since many recognize their own bank name when they call in and hang up without going through the identification procedure. *Id.*

GC Services' analysis independent of the Bank shows it takes at least 40 seconds to identify a caller's account information to allow GC Services' operator to proceed with any conversation. *Id.* Often, the process takes even longer, and 40 seconds is likely the minimum before which GC Services' operator would engage in any substantive discussion with the inbound caller. *Id.* Thus, any

inbound call of less than 40 seconds is almost surely a call during which the caller chose not to continue the call or provide sufficient information to identify their account. *Id*. This is not uncommon as many callers do not feel comfortable providing personal identifying information having called a number they see on their caller ID from a prior call. *Id*. In each such case, GC Services' operator would not have proceeded to discuss any matter with the caller and would have dispositioned the inbound call as Code 98. *Id*. Plaintiff has failed to challenge these undisputed facts.

As explained *supra*, Code 98 is used for many reasons unrelated to whether a call is with a Bank customer, let alone one who provides enough information to locate their account. *Id.*, at ¶ 9. Thus, the mere suggestion offered by Plaintiff, that a call coded 98, whether for an inbound or outbound call, indicates the number is unrelated to a Bank customer, is wholly inaccurate, at best, and, not surprisingly, wholly unsupported by the evidence. *Id*. To the contrary, all or substantially all calls, inbound or outbound, are coded 98 by GC Services' operators in their discretion for other reasons. *Id*. Code 98 simply does not mean, as Plaintiff's motion asserts, that any inbound or outbound call was from or to any number other than one provided by a FNBT customer as a number at which that customer could be called. *Id*, at ¶ 10.

Indeed, GC Services' corporate representative testified GC Services uses a **separate disposition code** and **procedure** when the individual, whether on an inbound or outbound call, informs a GC Services' agent they no longer want to be called;

> Q. And when somebody says, I don't want calls from – I don't want these courtesy reminder calls, is that indicated by the agent as [a Code 98] bad/wrong number?
>
> A. **No. There would be a – a release key to cease and desist with the customer.**
>
> …
>
> Q. But if the person said just, Wrong number, there wouldn't be a release key to cease and desist for that number?

> A     No.

*Id.*, 31:19-31:24, 32:3-32:6 (emphasis added).

> Q.     Okay. Do you know if a cease and desist was ever sent to the bank on calls to this number here [(505) xxx-4951] reflected in Plaintiff's 3?
>
> A.     No. **You can only have one disposition code for a call**.
>
> Q.     Okay. And other than Plaintiff's 3, in any of the records you've seen for calls to this 4951 number, have you seen any cease and desist directives?
>
> A.     No.
>
> Q.     What would those look like if you were to see it?
>
> A.     The verbiage would be cease and desist or C&D.

*Id.*, 41:13-42:1 (emphasis added).

Accordingly, the undisputed evidence proves neither Plaintiff nor any member of the class, which is exclusively made up of individuals to whom the Bank's agents or the Aspect System assigned Code 98, **ever** instructed GC Services to stop calling because such an instruction is the basis for a **different disposition code which cannot be combined with Code 98**.

**b.**     **Procedural History of the Instant Lawsuit**

On June 30, 2014, GC Services began calling the customer it believed to be the FNBT customer who had provided the phone number (505) xxx-4951 to inform her of her overdrawn status. Ex. 1, 58:17-59:15, 61:12-61:20; [Dkt. 41, at ¶ 10]. In fact, GC Services was calling Plaintiff Janine LaVigne at that phone number. Ex. 4, 8:12-8:18.

On October 19, 2015, Plaintiff filed this lawsuit as a potential class action under the TCPA. Plaintiff is an individual resident of New Mexico, who alleges in her second amended class action complaint, [Dkt. 41], that, in or around July 2014, the Bank, through GC Services, began calling her on her cellular telephone, (505) xxx-4951, using an ATDS. [Dkt. 41, at ¶¶ 10-11, 16]. Plaintiff further alleges that, during phone calls only to her, the Bank's representatives said they were calling

for someone named Belinda Lucero, who Plaintiff asserts she does not know. *Id.*, at ¶¶ 17, 23. Plaintiff claims she told GC Services they were calling the wrong number and to stop calling her. *Id.*, at ¶ 18. But, Plaintiff also admits that, even after retaining an attorney, she did not ask her lawyer to contact GC Services, but, instead, allowed the calls to continue. Ex. 4, 48:12-51-24.[2] Plaintiff does not present any evidence refuting The Bank's assertion that a Bank customer provided that number to the Bank.

Plaintiff moved for class certification on March 17, 2017. [Dkt. 74]. While Plaintiff's motion was pending, the U.S. Court of Appeals for the District of Columbia Circuit issued an opinion in *ACA Int'l v FCC*, 885 F.3d 687 (D.C. Cir. 2018) on March 16, 2018. As discussed *infra*, the D.C. Circuit's opinion in *ACA* is fatal to Plaintiff's TCPA claims in the instant lawsuit. Since, on two points the ACA *decision* affects the instant lawsuit, the Bank moves for summary judgment as to Plaintiff's TCPA claims in light of *ACA* and its progeny, the former of which has significantly changed controlling law.

<u>**ARGUMENT & AUTHORITIES**</u>

a.   **Standard of Review**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Alternatively, the moving party can demonstrate that the

---

[2] Plaintiff is a previous TCPA plaintiff who clearly knew what steps to take if she did not want to be called.

non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. *Id.*

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting then-FED. R. CIV. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255.

**b.   Following the D.C. Circuit's opinion in *ACA Int'l v. FCC*, courts must apply the TCPA's statutory definition to determine whether a device is a prohibited ATDS.**

On March 16, 2018, the Court of Appeals for the D.C. Circuit issued an opinion in *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018). In accordance with this Court's Order granting the parties leave to file cross-motions for summary judgment, [Dkt. 149], this motion discusses the Bank's entitlement to summary judgment based on two elements of the *ACA* decision, as well as subsequent opinions interpreting and applying the *ACA* holding.

**1.   Procedural history of the FCC's declaratory rulings interpreting the statutory definition of ATDS.**

The Telephone Consumer Protection Act of 1991 prohibits "using any automatic telephone dialing system" to call emergency-service numbers, hospital rooms, cellphones, and other specialized lines. 47 U.S.C. § 227(b)(1)(A). It defines an automatic telephone dialing system, or ATDS, as "equipment which has the capacity — (A) to store or produce telephone numbers to be

called, using a random or sequential number generator; and (B) to dial such numbers." *Id.*, at § 227(a)(1).

These provisions targeted harmful dialing practices that had emerged in the 1980s. At that time, "telemarketers typically used autodialing equipment that either called numbers in large sequential blocks or dialed random 10-digit strings." *Dominguez v. Yahoo, Inc.*, 629 F. App'x 369, 372 (3d Cir. 2015). Random dialing allowed callers to reach and tie up unlisted and specialized numbers. S. Rep. No. 102-178, at 2 (1991). And sequential dialing allowed callers to reach all such numbers in an area, creating a "potentially dangerous" situation in which no outbound calls could be placed. H.R. Rep. No. 102-317, at 10 (1991).

The FCC "initially interpreted the [TCPA] as specifically targeting equipment that placed a high volume of calls by **randomly** or **sequentially generating** the numbers to be dialed." *Dominguez*, 629 F. App'x at 372 (emphasis added). In its first TCPA-related order issued in 1992, the Commission declared that equipment with "speed dialing," "call forwarding," and "delayed message" functions are not ATDSs, "because the numbers called are not generated in a random or sequential fashion." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, ¶ 47 (1992). The FCC later explained the TCPA's ATDS provisions do not apply to calls "**directed to [a] specifically programmed contact numbe[r]**" rather than "to randomly or sequentially generated numbers." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, ¶ 19 (1995) (emphasis added). The scope of the TCPA's ATDS restriction remained settled for over a decade.

In 2003, however, the Commission changed course. It ruled that "predictive dialers" — dialers that use algorithms to dial telephone numbers in a manner that "predicts" the time when the recipient will answer the phone — qualify as ATDSs. *In re Rules and Regulations Implementing the*

*Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶ 132 (2003). The Commission's interpretation, however, was "hardly a model of clarity." *Dominguez*, 629 F. App'x at 372. The Commission reaffirmed its 2003 interpretation in 2008 and again in 2012. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 5594, ¶¶ 12–14 (2008); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 15391, ¶ 2 n.5 (2012).

In 2015, the Commission revisited the definition of an ATDS. First, the Commission addressed what it means for a device to have the "capacity" to perform a given function — a subject the FCC's previous rulings had not resolved. On this point, the Commission concluded the "capacity" of a device includes its "potential functionalities" — in particular, functionalities the device could have if **reprogrammed** or **enhanced** with appropriate software. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, ¶ 16 (2015). Second, the Commission addressed the functions of an ATDS — the same subject addressed in its 1991, 1995, 2003, 2008, and 2012 Orders. On this point, the Commission reaffirmed its earlier orders and offered a variety of tests for the requisite "capacity." *Id.*, at ¶ 10.

In 2015, a group of petitioners challenged the Commission's 2015 Order. On March 16, 2018, the D.C. Circuit issued an opinion in *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018), setting the Commission's interpretation of "capacity" aside. The *ACA* court held the Commission's interpretation was too broad. If "capacity" includes "features that can be added through software changes or updates," any smartphone would be an ATDS, because "any smartphone, with the addition of software, can gain the statutorily enumerated features." 885 F.3d at 296. The D.C. Circuit also set aside the Commission's interpretation of the functions of an ATDS as enacted in the 2015 Order, as well as the 2003, 2008, and 2012 Orders the 2015 Order reaffirmed. *Id.*, at 703. *See, e.g.*,

*Pinkus v. Sirius XM Radio, Inc.*, 319 F.Supp. 3d 927, 935 (N.D. Ill. 2018); *Gary v. TrueBlue, Inc.*, 2018 U.S. Dist. LEXIS 175021, (E.D. Mich. Oct. 11, 2018); *Herrick v. GoDaddy.com LLC*, 312 F.Supp. 3d 792 (D. Ariz. 2018); *Sessions v. Barclays Bank Delaware*, 317 F.Supp. 3d 1208, 1212-13 (N.D. Ga. 2018); *Marshall v. CBE Grp., Inc.*, 2018 U.S. Dist. LEXIS 55223 (D. Nev. Mar. 30, 2018).

The D.C. Circuit expressly held the Commission's interpretation of an ATDS was "arbitrary and capricious" because it failed to articulate a comprehensible test. In some places, the Commission suggested "a device must *itself* have the ability to generate random or sequential telephone numbers to be dialed." *ACA.*, at 701 (emphasis in original). In others, the Commission suggested it is "enough that the device can call from a database of telephone numbers generated elsewhere." *Id.* Because the Commission's interpretation contradicted itself, it had to be set aside. *Id.*

### 2. A device's capacity only includes the functions it can perform as currently programmed.

The D.C. Circuit found that "the statutory definition of an ATDS raises two sets of questions: (i) when does a device have the 'capacity' to perform the functions of an autodialer enumerated by the statute? and (ii) what precisely is the content of those functions?" 885 F.3d at 695. The D.C. Circuit's opinion in *ACA* directly answers the first question: a device has the "capacity" to do something only if it has the **present ability** to do so. *Id.*, at 700.

The D.C. Circuit held it was "utterly unreasonable" for the Commission to interpret "capacity" to include "features that can be added through software changes or upgrades." 885 F.3d at 699. The court held such an "expansive interpretation" had the "effect of embracing any and all smartphones," because "it's trivial to download an app, update software, or write a few lines of code that would modify a phone to dial random or sequential numbers." *Id.* at 696. "If a device's 'capacity' includes functions that could be added through app downloads and software additions, and

if smartphone apps can introduce ATDS functionality into the device, it follows that all smartphones, under the Commission's approach, meet the statutory definition of an autodialer." *Id.*

The D.C. Circuit considered this result legally "untenable." *Id.*, at 698. By 2016, "nearly 80% of American adults had become smartphone owners." *Id.*, at 697-98. The FCC's definition of an ATDS cannot reasonably be interpreted "in a manner that brings within the definition's fold the most ubiquitous type of phone equipment known, used countless times each day for routine communications by the vast majority of people in the country." *Id.*, at 698. "It cannot be the case that every uninvited communication from a smartphone infringes federal law, and that nearly every American is a TCPA-violator-in-waiting, if not a violator-in-fact." *Id.*

The D.C. Circuit's decision thus resolves the issue of what "capacity" means or at least nullifies the FCC's definition upon which the Plaintiff here relies.. The capacity of a device includes, at most, the functions it can perform with the software that is currently installed on it. The capacity of a device does not include abilities that a device could acquire through the downloading of new applications, through the addition of new software, or through reprogramming or changing its physical or technological configuration. Indeed, it would be "utterly unreasonable" to interpret the statute in the latter way.

### 3.      A device is only an ATDS if it can generate automatically dial random or sequential numbers.

The second issue raised by the definition of an ATDS is: what functions must a device have the capacity to perform in order to qualify as an ATDS? The D.C. Circuit held the Commission's post-2003 reading of the statute was arbitrary and capricious because it was self-contradictory, but the court did not spell out what the correct reading of the statute would be. *ACA*, at 703; s*ee Pinkus v. Sirius XM Radio, Inc.*, 319 F.Supp. 3d 297, 936 (N.D. Ill. 2018) ("Although [the *ACA* opinion]

invalidated the FCC's rulings, *ACA International* did not itself articulate a definitive view of which functions characterize an ATDS").

This Court must therefore resolve the question for itself, the same way it would resolve any other question of statutory interpretation; by examining the statute and any valid regulatory guidance. As several courts have held, the answer to this question is simple. To constitute an ATDS, a device must be capable of automatically generating and calling **random** or **sequential** numbers. A device does not become an ATDS simply because it can call from a list.

In *Pinkus v. Sirius XM Radio, Inc.*, the court discussed, in great detail, why, following *ACA*, the TCPA's definition of an ATDS excludes devices such as predictive dialers. 319 F.Supp. at 937-40. The *Pinkus* court held the phrase "using a random or sequential number generator" applies to the manner in which the numbers make their way onto the list – not to the manner in which the numbers are dialed once they are on the list:

> Because the phrase 'using a random or sequential number generator' refers to the kinds of 'telephone numbers to be called' that an ATDS must have the capacity to store or produce, it follows that that phrase is best understood to describe the process by which those numbers are generated in the first place … . As a result, were the phrase 'using a random or sequential number generator' understood to refer to how numbers are called rather than to how they are generated, it would be superfluous, as it would simply encompass the universe of possible orders in which numbers could be dialed [from a set list].

*Pinkus*, 319 F.Supp. 3d at 938. *See also Dominguez*, 629 F. App'x at 372 (noting that "random or sequential" number generation refers to the numbers themselves rather than the manner in which they are dialed). The *Pinkus* court further explained:

> But what kinds of numbers? Given its placement immediately after 'telephone numbers to be called,' the phrase 'using a random or sequential number generator' is best read to modify 'telephone numbers to be called,' describing a quality of the numbers an ATDS must have the capacity to store or produce. Had Congress meant 'using a random or sequential number generator' to modify the verbs 'store' and 'produce,' Congress would have placed the phrase immediately after those verbs and before 'telephone numbers to be called' — with subsection (a)(1)(A) reading, 'to

> store or produce, using a random or sequential number generator, telephone numbers to be called.' Indeed, it would be odd to read the phrase 'using a random or sequential number generator' as modifying 'store' and 'produce.' The comma separating 'using a random or sequential number generator' from the rest of subsection (a)(1)(A) makes it grammatically unlikely that the phrase modifies only 'produce' and not 'store,' and yet it is hard to see how a number generator could be used to 'store' telephone numbers.

*Pinkus*, 319 F.Supp. 3d at 938. *See also*, *Fleming v. Associated Credit Servs.*, 2018 U.S. Dist. LEXIS 163120, *26-28 (D. N.J. Sept. 21, 2018). Thus, "the best reading of 47 U.S.C. § 227(a)(1) requires that an ATDS have the capacity to generate numbers randomly or sequentially and then to dial them, even if that capacity is not deployed for practical reasons." *Pinkus*, at 939.

The ATDS definition further requires the equipment to be capable of performing these functions automatically — without human intervention. Section § 227(a)(1) defines "automatic telephone dialing system," and the Court "cannot forget that [it] ultimately [is] determining the meaning of [that] term" when parsing subsections 227(a)(1)(A) and 227(a)(1)(B). *Leocal v. Ashcroft*, 543 U.S. 1, 11 (2004). Because something "automatic" can "wor[k] by itself with little or no direct human control" (The New Oxford American Dictionary (1st ed. 2001)), an "automatic" telephone dialing system must be able to perform the requisite functions without human assistance. As the D.C. Circuit held: "[The] 'automatic' in 'automatic telephone dialing system … would seem to envision non-manual dialing of telephone numbers." *ACA*, 885 F.3d at 703.

The same result follows from the Commission's 1992 and 1995 Orders. Those Orders expressly state that a device is an ATDS only if "the numbers called are … generated in a random or sequential fashion." 1992 Order ¶ 47; *see* 1995 Order ¶ 19; *Dominguez*, 629 F. App'x at 372 (the FCC "initially interpreted the [TCPA] as specifically targeting equipment that placed a high volume of calls by randomly or sequentially generating the numbers to be dialed").

Now that the D.C. Circuit has set aside the Commission's more recent rulings, the 1992 and 1995 Orders constitute the Commission's only valid pronouncements about the functions of an ATDS. The Commission has never reversed, vacated, or disavowed those Orders. Neither has any Court ever done so. Rather, the Commission muddied those Orders starting in 2003 by suggesting that devices that call from lists could qualify as ATDSs even if they cannot generate random or sequential telephone numbers. The D.C. Circuit, however, set aside those later rulings in *ACA*. By doing so, the D.C. Circuit left the 1992 and 1995 Orders standing as the Commission's last word about the functions of an ATDS.

The 1992 and 1995 Orders reinforce the interpretation of the statute set out above. An agency's interpretation of a statute is entitled to deference so long as the interpretation is reasonable. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). An agency's interpretation deserves even more weight when the interpretation is "contemporaneous" with the passage of the statute; in that case, the agency's reading provides powerful evidence of the statute's original meaning. *Public Citizen v. U.S. Department of Justice*, 491 U.S. 440, 463 n.12 (1989); *see Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 315 (1933) ("[Administrative] practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new"). The relevant portions of the 1992 and 1995 Orders reasonably interpret the statute, and the Commission adopted them contemporaneously with the TCPA's enactment in 1991. As a result, they deserve controlling weight here.

There is no basis in either the statute or the Commission's 1992 and 1995 Orders to treat a device as an ATDS simply because it can call from a database. The statute defines an ATDS as a

device that has the capacity to "generat[e]" "random or sequential number[s]" "to be called;" it does not define an ATDS as a device that has the capacity "to dial telephone numbers from a database." 47 U.S.C. § 227(a)(1). Moreover, the 1995 Order expressly rejects the application of the TCPA to calls "directed to specifically programmed contact numbers" rather than to "randomly or sequentially generated numbers." 1995 Order ¶ 19.

The D.C. Circuit's decision in *ACA* reinforces this point. The *ACA* court held there is "a difference between calling from a list of numbers, on the one hand, and creating and dialing … random or arbitrary … numbers, on the other hand." *ACA*, 885 F.3d at 702. Put another way, "numbers that are randomly or sequentially generated differ from numbers that come from a calling list." *Id.* The TCPA and the Commission's 1992 and 1995 Orders refer only to calling "random" and "sequential" numbers. They say nothing about lists.

**4.     Since the D.C. Circuit issued its opinion in *ACA*, numerous district and circuit courts have held *ACA* set aside the FCC's 2003 and 2008 Orders and, thus, the Court must apply the statutory, as opposed to regulatory, definition of ATDS.**

Since the D.C. Circuit issued its opinion in *ACA*, numerous courts have held *ACA* vacated the FCC's expansive interpretation of ATDS as set forth in its 2003, 2008, and 2015 Orders, thus, the plain language of the statute applies.[3] For example, in *Pinkus*, the court held "it necessarily follows that [*ACA*] invalidates not only the 2015 Declaratory Ruling's understanding that all predictive dialers qualify as ATDSs, but also the 2003 Order and 2008 Declaratory Ruling to the extent they express the same understanding." 319 F.Supp. 3d at 935.

---

[3] *See Pinkus v. Sirius XM Radio, Inc*., 319 F.Supp. 3d 927, 935 (N.D. Ill. 2018); *Gary v. TrueBlue, Inc.*, 2018 U.S. Dist. LEXIS 175021, (E.D. Mich. Oct. 11, 2018); *Herrick v. GoDaddy.com LLC*, 312 F.Supp. 3d 792 (D. Ariz. 2018); *Sessions v. Barclays Bank Delaware*, 317 F.Supp. 3d 1208, 1212-13 (N.D. Ga. 2018); *Marshall v. CBE Grp., Inc.*, 2018 U.S. Dist. LEXIS 55223 (D. Nev. Mar. 30, 2018).

However, as Plaintiff correctly points out in her motion for summary judgment, [Dkt. 158-1, at pp. 12, 16-19], there is no unanimity among courts regarding this interpretation of *ACA*. In support of this assertion, as well as her argument that the 2003 and 2008 Orders are still valid, Plaintiff discusses the Southern District of Florida's opinion in *Reyes v. BCA Fin. Servs., Inc.*, 312 F.Supp. 3d 1308 (S.D. Fla. 2018).[4] However, Plaintiff ignores the fact that *Reyes*, and the handful of post-*ACA* opinions which rely upon *Reyes*, all misinterpret the plain language of *ACA*.

In *Reyes*, the court held *ACA* vacated portions of the 2015 Order, but found nothing in *ACA* that explicitly stated the 2003 and 2008 Orders were overruled. 312 F.Supp. at 702. This conclusion ignores the patent confusion stemming from the FCC's Orders – the reason the D.C. Circuit unequivocally set aside portions of the 2015 Order. To find the D.C. Circuit set aside the 2015 Order because it was unreasonable, but leave in place the prior orders suffering from the same flaws upon which the 2015 Order was based simply does not make sense.

Contrary to Plaintiff's assertions, this Court is left with, and bound by, the plain language of the TCPA and its statutory definition of ATDS rather than the FCC's now-vacated interpretations. As the D.C. Circuit held:

> The [2015] order's lack of clarity about which functions qualify a device as an autodialer compounds the unreasonableness of the Commission's expansive understanding of when a device has the "capacity" to perform the necessary functions. **We must therefore set aside the Commission's treatment of those matters**.

*ACA*, 885 F.3d at 703 (emphasis added). The Commission's understanding of when a device qualifies as an ATDS was not limited to its 2015 Order. Indeed, the 2015 Order reaffirmed the 2003 and 2008 Orders on that point.

---

[4] Plaintiff boldly claims "the **majority** of Courts to address the issue have found that *ACA* was limited to the 2015 Order and did not reach back and overturn the FCC's 2003 and 2008 Orders," without offering any evidence of her claim other than a string cite of cases holding in accordance with *Reyes*. [Dkt. 158-1, at p. 12] (emphasis added).

Moreover, *Reyes* is likely not even good law within the Eleventh Circuit, where other courts within that Circuit have already significantly questioned the validity of the *Reyes* opinion since it was issued last May. In *Sessions v. Barclays Bank Del.*, decided a little more than a month after *Reyes*, the Northern District of Georgia held "[c]ontrary to the pronouncement of the *Reyes* court, the D.C. Circuit clearly held that it invalidated **all of the FCC's pronouncements as to the definition of 'capacity'** as well as its descriptions of the statutory functions necessary to be an ATDS" and "**[t]he D.C. Circuit 'set aside the [FCC's] treatment of [the 2003 and 2008 Orders]' without qualification**." *Sessions v. Barclays Bank Del.*, 317 F.Supp. 3d 1208, 1212, 1213 (N. D. Ga. 2018) (emphasis added).  Similarly, in *Gonzalez v. Ocwen Loan Servicing, LLC*, the Middle District of Florida held:

> [In *ACA*,] the D.C. Circuit tackled head on the issue of whether it could review the FCC's interpretation of what devices should be considered ATDSs — **regardless of when the FCC first applied the definition**. The D.C. Circuit rejected the FCC's argument that the court could not review the interpretation what devices constitute ATDSs since neither its 2003 nor 2008 Orders establishing the definition were appealed. Instead, the D.C. Circuit held it had jurisdiction to review the definition reaffirmed in the FCC's 2015 Order and vacated it. **In doing so, the D.C. Circuit necessarily vacated the definition in the prior FCC Orders that the 2015 Order merely reaffirmed**. To conclude otherwise would mean that courts are required to apply the definition of an ATDS — from the 2003 and 2008 Orders — that the D.C. Circuit vacated when reviewing the 2015 Order.

2018 U.S. Dist. LEXIS 153480, *14 (M.D. Fla. Sept. 5, 2018) (emphasis added) (internal citations omitted). Plaintiff appears to rely on *Reyes* only, because it says what she wants to hear and not because it presents a sound legal argument.

Indeed, and certainly fatal to Plaintiff's reliance on *Reyes*, in *Adams v. Ocwen Loan Servicing, LLC*, the Southern District of Florida – the same court that issued the opinion in *Reyes* – recently held "**the FCC's 2003 and 2008 Orders' interpretation of the statutory meaning of an ATDS were voided and vacated by the D.C. Circuit's recent decision in *ACA***, which struck

down the FCC's 2015 Order interpreting what devices should be considered ATDSs under the TCPA." 2018 U.S. Dist. LEXIS 184513, *7 (S.D. Fla. Oct. 26, 2018) (emphasis added). Just as the *Adams* court explained, because of the D.C. Circuit's opinion in *ACA* and subsequent opinions applying *ACA*'s holding, this Court should not defer to the FCC's understanding of the capacity and functions of an ATDS under the Commission's 2003, 2008, or 2015 Orders.

### 5.   As a matter of law, the Aspect Unified IP system is not an ATDS.

As a matter of law, the Aspect Unified IP system used by GC Services to make courtesy calls to the Bank's customers is not an ATDS because it does not have the capacity to generate and dial random or sequential telephone numbers. Again, to qualify as an ATDS under the TCPA, a piece of equipment must have "the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

The undisputed evidence in the instant lawsuit proves the Aspect System lacks the capacity to function as an ATDS. The Aspect System could only call telephone numbers associated with the Bank's customers whose phone numbers were included on a list provided to GC Services by the Bank and the Aspect System cannot, as presently constituted or at the "flip of a switch," perform autodialer tasks, i.e., generate and dial phone numbers at random or sequentially. *See* Ex. 6, at ¶¶ 8, 9; *King v. Time Warner Cable Inc.*, 894 F.3d 473, 478079 (2d. Cir. 2018); *Dominguez v. Yahoo!, Inc.*, 894 F.3d 116, 120 n.3 (3d Cir. 2018).

In *King v. Time Warner Cable Inc.*, the Second Circuit held the term capacity of an autodialer "should be interpreted to refer to a device's **current functions, absent any modifications to the device's ... software**." 894 F.3d 473, 481 (2d. Cir. 2018) (emphasis added). Like the defendant in *King*, "[the Bank] admits that [the Aspect System] has the capacity to store numbers and dial them, but asserts that it does not have the capacity to make random or sequentially generated calls." *Compare*, *id.*, at 475. Further, while the Second Circuit in *King* held it could not conclude, as a

matter of law, the defendant's different system lacked the present capacity to meet the statutory definition of an ATDS under the TCPA, *id.*, at 481, the undisputed evidence supports such a conclusion here. *See* Ex. 6, at ¶ 9.

Moreover, and fatal to Plaintiff's TCPA claims, the Eastern District of Michigan recently determined the Aspect Unified IP system, the very same system[5] used by GC Services to call the Bank's customers, is not an ATDS as a matter of law. *Keyes v. Ocwen Loan Servicing, LLC*, 2018 U.S. Dist. LEXIS 138445 (E.D. Mich. Aug. 16, 2018) (granting Defendant Ocwen's motion for partial summary judgment as to Plaintiff's TCPA claims following D.C. Circuit's opinion in *ACA*). Under strikingly similar facts, the defendant in *Keyes v. Ocwen Loan Servicing, LLC* used an Aspect Unified IP system to call debtors to collect overdue payments. *Keyes*, at *3. Regarding the Aspect System's capacity to function as an ATDS, the court held:

> [T]he statutory language mandates the following examination: how much is required to enable the device to function as an autodialer: does it require the simple flipping of a switch, or does it require essentially a top-to-bottom reconstruction of the equipment? The former would constitute an ATDS, whereas the latter would not….
>
> Here, [Defendant] Ocwen has demonstrated as a matter of law that **the Aspect System which it used requires more than a flip of a switch to qualify as an autodialer**. Indeed to modify the Aspect System, Ocwen would need to alter the system's source code, and it does not have access to the code….
>
> **Accordingly, all reasonable persons would conclude that the Aspect System does not have the capacity to function as an ATDS**.

*Id.*, at *19-21 (internal citations and quotations omitted) (emphasis added). *See also*, *Herrick v. GoDaddy.com LLC*, 312 F.Supp. 3d 792, 800 (D. Ariz. 2018) ("[A]lthough it may be theoretically plausible that the 3Seventy Platform could be reprogrammed to have this capacity [to function as an

---

[5] In *Keyes*, Ocwen used Aspect Unified IP ver. 6.6 and 7.2. *See* Defendant's Response to Plaintiff's Statement of Material Facts Not in Dispute, No. 2:17-cv-11492-GAD-SDD (E.D. Mich. Jun. 21, 2018), ECF No. 83-1, at p. 3. By comparison, GC Services used Aspect Unified IP ver. 6.5.1, 6.6, 6.7, and 7.3 to place courtesy calls to the Bank's customers. Ex. 4, at ¶¶ 3-6.

ATDS], it is undisputed that to enable such capability, a user would have to do much more than simply press a button").

The same is necessarily true here. The undisputed evidence shows the Bank, through GC Services, would need to do more than flip a switch or press a button for the Aspect System to qualify as an ATDS. *See* Ex. 6, at ¶¶ 8, 9. Thus, the Aspect System lacks the capacity to function as an ATDS and GC Services' use of the Aspect System cannot subject the Bank to liability under the TCPA.

The *Keyes* court similarly held the Aspect System did not possess the requisite functionality to qualify as an ATDS under the TCPA as the undisputed evidence shows in the instant case;

> **[t]he Aspect System dials from a set list, but that is not the same as dialing numbers using a random or sequential number generator**…. The better reading of the [TCPA], this Court will conclude, is that devices must be able to generate **random** or **sequential** numbers to be dialed to qualify as an ATDS….
>
> All agree that the Aspect System dials numbers from a set list. The parties further agree that the system does not produce or store numbers using a random or sequential number generator, and call those numbers. And, as described above, Ocwen does not have the capacity to effect this change in the Aspect System. **Thus, the Aspect System**—as [Plaintiff] Keyes has described it—**is not an ATDS because it lacks the necessary functionality**.

*Keyes*, at *21-22 (internal citations and quotations omitted) (emphasis added). Like the Aspect System in *Keyes*, the Aspect System used by the Bank's vendor GC Services could only call telephone numbers provided on a daily pre-programed list by the Bank. Ex. 6, at ¶ 8. The Aspect System cannot generate and dial sequential or random telephone numbers. *Id.*, at ¶ 9.

Without the capacity or functionality of an ATDS, the *Keyes* court held "**the Aspect System is not an ATDS as a matter of law**" and granted Defendant Ocwen summary judgment on the plaintiff's TCPA claim. *Id.*, at *23 (emphasis added).  The outcome should be no different in the present case. The undisputed evidence demonstrates the Aspect System used by the Bank's vendor

GC Services lacked the capacity and functionality of an ATDS at all time relevant to this lawsuit. *See* Ex. 6, ¶¶ 8,9.

Plaintiff nevertheless argues that, even if this Court does not apply the expansive interpretations of ATDS under the FCC's 2003 and 2008 Orders, the Aspect System is still an ATDS under statutory language of the TCPA. [Dkt. 158-1, at p. 19]. Plaintiff's assertion relies, in pertinent part, on recent opinions[6] that interpret § 227(a)(1) to include "a device that stores numbers to be called, whether or not those numbers have been generated by a random or sequential number generator." *Id.*, at p. 22. However, this interpretation adds to and modifies the statutory definition of ATDS, something no court is authorized to do to a statutory enactment.

For example, in *Marks v. Crunch San Diego, LLC*, the Ninth Circuit held the statutory definition of ATDS was ambiguous and modified the term automatic telephone dialing system to mean "equipment which has the capacity — (1) to  store numbers to be called **or** (2) to produce numbers to be called, using a random or sequential number generator — and to dial such numbers." 904 F.3d 1041, 1952 (9th Cir. 2018) (emphasis added). The TCPA, however, defines an ATDS to be "equipment which has the capacity — (A) to store or produce telephone numbers to be called, using a random or sequential number generator … ." 47 U.S.C. § 227(b)(1)(A). There is no "or" in the plain language of the statute.

The District of New Jersey recently addressed this issue in *Fleming v. Associated Credit Servs.*, 2018 U.S. Dist. LEXIS 163120 (D. N.J. Sept. 21, 2018). In that case, the court specifically

---

[6] *Heard v. Nationstar Mortgage, LLC*, 2018 U.S. Dist. LEXIS 143175 (N.D. Ala. Aug. 23, 2018); *Somogyi v. Freedom Mortg. Corp.*, 2018 U.S. Dist. LEXIS 129697 (D. N.J. Aug. 2, 2018); *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018); and *Adams v. Ocwen Loan Servicing, LLC*, 2018 U.S. Dist. LEXIS 184513 (S.D. Fla. Oct. 29, 2018).

As discussed *supra*, *Marks* and *Adams* undermine Plaintiff's primary argument that the *ACA* opinion did not set aside the FCC's 2003 and 2008 Orders. *Heard* and *Somogyi* similarly hold the D.C. Circuit set aside the 2003 and 2008 Orders. Plaintiff concedes this point, while relying on the foregoing opinions to support her argument that the Aspect System is an ATDS under the statutory definition.

considered whether "a system that dials numbers from a list that was not randomly or sequentially generated when the list was created qualify as an ATDS?" *Fleming*, at *26. Applying *Pinkus*, the *Fleming* court held:

> With only the statutory text to guide me, I am convinced that the answer is no. **The phrase "using a random or sequential number generator," I believe, applies to the manner in which the numbers make their way onto the list** – not to the manner in which the numbers are dialed once they are on the list.

*Id*. (citing *Pinkus*, 319 F.Supp. 3d at 938) (emphasis added). Accordingly, the *Fleming* court granted the defendant summary judgment because the plaintiff had not sufficiently shown the device at-issue was an ATDS under the plain language of the TCPA. *See id*., at *33. Of course, in the case at bar, the undisputed evidence disproves any such allegation.

Plaintiff's assertion also fails because it does not take into account the FCC's still valid 1992 and 1995 Orders, which declare equipment with speed dialing, call forwarding, and delayed message functions are not ATDSs because the numbers called **are not generated in a random or sequential fashion**, 7 FCC Rcd. 8752, ¶ 47, and the TCPA's ATDS provisions do not apply to calls "**directed to [a] specifically programmed contact numbe[r]**" rather than "to randomly or sequentially generated numbers." 10 FCC Rcd. 12391, ¶ 19 (emphasis added).

Additionally, as a result of more recent opinions within their respective circuits, *Heard v. Nationstar Mortgage* and *Somogyi v. Freedom Mortg. Corp*. may not be good law. As discussed *supra*, district courts within the Eleventh Circuit are severely split regarding the interpretation of *ACA*. *See, e.g., Sessions v. Barclays Bank Del.*, 317 F.Supp. 3d 1208, 1212, 1213 (N. D. Ga. 2018); *Gonzalez v. Ocwen Loan Servicing, LLC*, 2018 U.S. Dist. LEXIS 153480, *14 (M.D. Fla. Sept. 5, 2018). Similarly, the District of New Jersey's more recent opinion in *Fleming* calls into question the same court's earlier holding in *Somogyi*. *Fleming*, 2018 U.S. Dist. LEXIS 163120. Further, the *Somogyi* opinion does not conclude whether the device at issue is an ATDS. Instead, the court

ordered the parties to conduct additional discovery regarding the device's present capacity to function as an ATDS. *See* 2018 U.S. Dist. LEXIS 129697 at *12 n.5 ("[F]actual discovery is necessary to determine whether the particular systems and procedures alleged by Plaintiffs, which lie within the literal statutory definition of an ATDS, were actually employed by FMC").

Accordingly, because there is no genuine issue of material fact or any legal authority supporting Plaintiff's argument that the Aspect System is an ATDS, the Court should grant the Bank summary judgment on Plaintiff's TCPA claims.

### 6. The Bank's interpretation of an ATDS is well-supported by binding and persuasive authority, thus its application will not lead to "absurd results."

In her motion for summary judgment, Plaintiff correctly claims the Bank is "essentially arguing that, to be an ATDS under the TCPA, sequential and random number generation requires that the system must generate new numbers sequentially or randomly from whole cloth." [Dkt. 158-1, at p. 24]. However, Plaintiff boldly and baldly adds, "[t]his is a maximalist and absurd interpretation of the TCPA." *Id*. The only thing that is absurd is Plaintiff's argument.[7]

In *King v. Burwell*, Justice Scalia defined an absurd result as "a consequence 'so monstrous, that all mankind would without hesitation, unite in rejecting the application.'" 135 S. Ct. 2480, 2497 (2015) (Scalia, J., dissenting) (quoting *Sturges v. Crowninshield*, 4 Wheat. 122, 203 (1819)). Although the D.C. Circuit did not articulate a definitive view of which functions characterize an ATDS in *ACA*, it made clear the FCC's more recent definitions are void and it laid the groundwork for other courts to reasonably interpret the statute. *See ACA*, 885 F.3d at 695-96. The bases for the Bank's motion for summary judgment are the litany of recent district and circuit court opinions

---

[7] For example, Plaintiff claims "to be an ATDS under Defendants' interpretation of the statute, a system would have to dial sequentially through that list of ten billion phone numbers or randomly generate numbers within that set." [Dkt. 158-1, at p. 24]. The Bank certainly does not claim a device is not an ATDS unless it embarks on the Sisyphean task of generating and dialing *every* ten-digit telephone number in existence. And, notably, Plaintiff provides neither a legal or factual basis for such a hyperbolic assertion.

correctly and rationally applying *ACA* and to hold that the capacity of a device includes a device's current functions, absent any modifications to the device's hardware or software, to generate and dial numbers sequentially or randomly. *See, e.g., King v. Time Warner Cable Inc.*, 894 F.3d at 481.

At a minimum, the existence of ample authority supporting the Bank's motion demonstrates there will be no "consequence so monstrous, that all mankind would without hesitation, unite in rejecting the application." Thus, the application of the TCPA, as interpreted by the Bank and supported by the authority cited and discussed herein, cannot lead to an absurd result.

**c.    Alternatively, there is no genuine issue of material fact as to the TCPA claims of most, if not all, of the potential class members called by GC Services at the Bank's direction.**

Alternatively, in the unlikely event the Court concludes the Aspect System is an ATDS, the Court should grant summary judgment as to the claims of potential class members who were called by the Bank on a cellphone number previously identified as belonging to a Bank customer, but subsequently reassigned to that class member or incorrectly listed in the first place.

Under the TCPA, it is unlawful "to make any call (other than a call made for emergency purposes or made with the **prior express consent of the called party**) using any automatic telephone dialing equipment or prerecorded voice." 47 U.S.C. § 227(b)(1)(A) (emphasis added). If the "called party" for those purposes refers to the intended recipient of a call or message, a caller would face no liability when using an ATDS to call a number believed to belong to a consenting party, even if the number in fact has been reassigned to another person who has not consented.

In the FCC's 2015 Declaratory Ruling, the Commission interpreted the term "called party" to mean "the person actually reached, the wireless number's present-day subscriber after reassignment (whose consent has not been obtained)." *ACA*, 885 F.3d at 705 (citing 30 FCC Rcd. at 7999-8001 ¶¶ 72-73). Thus, "the reassignment of a wireless number extinguishes any consent given by the number's previous holder and exposes the caller to liability for reaching a party who has not given

consent." *Id*. Alternatively, "the Commission reasoned, would 'effectively require consumers to opt out of such calls when the TCPA clearly requires the opposite—that consumers opt in before they can be contacted.'" *Id*. (citing 30 FCC Rcd. at 8004 ¶ 80).

However, the D.C. Circuit's opinion in *ACA* changed the law on whether "a caller violates the TCPA by calling a wireless number that has been reassigned from a consenting party to another person without the caller's knowledge." *Id*., at 694. In *ACA*, the D.C. Circuit held the FCC's "one-call safe harbor is arbitrary and capricious" and struck that provision of the regulation as unenforceable. *Id*., at 705. The *ACA* court further held that, because the one-call allowance is arbitrary, it also set aside the FCC's "treatment of reassigned numbers more generally." *Id*., at 706. Therefore, the *ACA* Court held until a caller affirmatively determines that the called number is no longer associated with a prior consenting party, the caller cannot be liable for calls to a number the caller reasonably relied on as previously consenting to receiving calls if the number was subsequently transferred. *See id*., at 708.

In the instant case, it is undisputed that every customer who opens an account with the Bank consents in writing to receive, at any one of the phone numbers the customer provides, phone calls from the Bank. Ex. 1, 86:14-86:16; Ex. 2, at ¶ 2.  Every phone number provided by the Bank to GC Services for the purpose of calling the Bank's customers was first provided to the Bank by a customer when the customer's account was opened. Ex. 2, at ¶¶ 2, 3. The Bank would not have had, or referred to GC Services to call, any phone number unless the Bank had received it from a customer as a phone number the Bank could use to reach the customer. *Id*., at ¶ 3.

While Plaintiff asserts she revoked consent to be called by the Bank, it is undisputed that the (505) xxx-4951 number reassigned to Plaintiff in March 2014 was included on a Bank signature card by a consenting Bank customer on October 4, 2013. Ex. 3. It is similarly undisputed that those

individuals who remain customers of the Bank cannot be members of the class. [Dkt. 134, at p. 18]. Thus, the only class members who remain, if any, are those whose cellphone numbers were reassigned to them from a customer of the Bank or were accidentally or purposely listed incorrectly by a Bank customer. Under *ACA*, there is no genuine issue of material fact as to those potential class members' TCPA claims against the Bank because the Bank, or its agent(s), can call that individual until the Bank affirmatively determines that the called number is no longer associated with a prior consenting Bank customer. *ACA*, 885 F.3d at 708.

Plaintiff, nevertheless, asserts that call logs produced by GC Services prove Plaintiff and the potential class members revoked their consent. [Dkt. 158-1, p. 26]. This is simply untrue. The undisputed evidence does not prove Plaintiff any potential class member revoked his or her consent to be called. *See* Ex. 5, 31:19-32:6, 41:13-42:1; Ex. 7, at ¶¶ 4-6, 8-11. Again, the source of Plaintiff's confusion is GC Services use of the shorthand "Bad/Wrong Number" for calls GC Services' agents designated code "98." As discussed at-length at pp. 6-9 *supra*, as well as in the Bank's brief in opposition to Plaintiff's motion for class certification, [Dkt 102], and surreply in support of the same, [Dkt. 133], code "98" is a catch-all, used for a variety of reasons, not just the called or calling party informing the GC Services it reached a bad or wrong number. *Id*. As GC Services' corporate representative sets forth in his declaration:

> There are no means by which anyone, including GC Services or FNBT, let alone a third party, can identify whether any call on the Code 98 list GC Services produced in response to Plaintiff's subpoena in this lawsuit was with someone other than a FNBT customer. Moreover, there are no means by which anyone, including GC Services or FNBT, let alone a third party, can identify the substance of any discussion in those cases where our operator spoke with a person, whether on an inbound or outbound call. Since the Code 98 disposition is used by the computer in some instances and by human operators in their discretion for numerous reasons related to a FNBT customer, it would be completely incorrect for someone to assert or assume that the presence of any number on the Code 98 list indicates any call involved someone who was not a FNBT customer and even more incorrect for

> anyone to assert or assume that the presence of any number on the Code 98 list
> indicates that someone advised our operator that they were not an FNBT customer

*Id.*, at ¶ 11. Further, and fatal to Plaintiff's liability argument, GC Services' agents applied a

completely different disposition code when the called or calling party instructed GC Services to stop

calling them;

> Q.      Okay. Do you know if a cease and desist was ever sent to the bank on calls to
>         this number here [(505) xxx-4951] reflected in Plaintiff's 3?
>
> A.      **No. You can only have one disposition code for a call**.
>
> Q.      Okay. And other than Plaintiff's 3, in any of the records you've seen for calls
>         to this 4951 number, have you seen any cease and desist directives?
>
> A.      **No.**
>
> Q.      What would those look like if you were to see it?
>
> A.      **The verbiage would be cease and desist or C&D.**

*Id.*, 41:13-42:1 (emphasis added).

Thus, there is no issue of genuine fact supporting Plaintiff's claim that Plaintiff or any

potential class members ever revoked their consent be called because those calls would not have

received a Code 98 disposition. Accordingly, the Court should deny Plaintiff's motion for summary

judgment on liability and grant the Bank summary judgment on the same issue.

## CONCLUSION AND PRAYER

After the D.C. Circuit's *ACA* decision, which set aside FCC rules essential to both Plaintiff's

claims under the TCPA and the creation and certification of a class, the Bank cannot be liable for

calls made using the Aspect System loaded with only externally supplied phone numbers provided

by bank customers, particularly when such a dialer is no longer prohibited under the TCPA

following *ACA*. Thus, there are now no genuine issues of material fact as to Plaintiff's TCPA claims

and, thus, the Bank is entitled to summary judgment as a matter of law.

Even if, *arguendo*, the Court does not agree that *ACA* applies to the dialer equipment at issue, the *ACA* decision further holds that the Bank cannot be liable for calls to phone numbers, exclusively provided by bank customers, where the Bank reasonably relied on prior consent until they could affirmatively determine consent had been withdrawn. As there is no genuine issue of material fact supporting Plaintiff's argument that any class member, let alone Plaintiff, ever revoked their consent, the Banks is entitled to summary judgment on the issue of consent..

Accordingly, the Bank  respectfully requests the Court grant this Motion, enter final judgment in its favor, and grant any other relief to which it is justly entitled.

Dated: November 14, 2018                    Respectfully submitted,

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By: */s/ William S. Helfand*
  William S. Helfand
  24 Greenway Plaza, Ste. 1400
  Houston, Texas 77046
  (713) 659-6767
  (713) 759-6830 (Fax)
  bill.helfand@lewisbrisbois.com

  **ATTORNEY FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the undersigned counsel has this date, November 14, 2018, electronically filed the foregoing with the Clerk of Court using the CM/ECF system. A copy of the foregoing has been served via email and fax on Plaintiff's counsel as follows:

Stephen Taylor
Lemberg Law, LLC
43 Danbury Road
Wilton, CT  06897
*Email: staylor@lemberglaw.com*
*Fax: (203) 653-3424*

*/s/ William S. Helfand*
William S. Helfand
