IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ORIGINAL

Janine LaVigne, on behalf
of herself and all others
similarly situated,

    Plaintiff,

                Civil Action No. 1:15-cv-00934-WJ-LF

vs.

First Community Bancshares, Inc.;
First National Bank Texas;
DOES 1-10 inclusive,

    Defendants.


DEPOSITION OF JANINE LAVIGNE


February 23, 2016
11:20 a.m.
612 First Street, NWk
Albuquerque, New Mexico  87102


PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE
this deposition was:


TAKEN BY:    William S. Helfand, Esq.
             Attorney for Defendants

REPORTED BY: Joe Jameson, NM CCR # 67
             Kendra Tellez Court Reporting, Inc.
             302 Silver Ave., SE
             Albuquerque, New Mexico   87102

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Janine LaVigne, on behalf
of herself and all others
similarly situated,

    Plaintiff,

        Civil Action No. 1:15-cv-00934-WJ-LF

vs.

First Community Bancshares, Inc.;
First National Bank Texas;
DOES 1-10 inclusive,

    Defendants.

DEPOSITION OF JANINE LAVIGNE

February 23, 2016
11:20 a.m.
612 First Street, NWk
Albuquerque, New Mexico 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE this deposition was:

TAKEN BY: William S. Helfand, Esq.
          Attorney for Defendants

REPORTED BY: Joe Jameson, NM CCR # 67
             Kendra Tellez Court Reporting, Inc.
             302 Silver Ave., SE
             Albuquerque, New Mexico 87102

## Page 2

APPEARANCES

For the Plaintiff:
  LEMBERG LAW
  1100 Summer Street, Third Floor
  Stamford, Connecticut 06905
  By: Stephen Taylor, Esq.
  staylor@lemberglaw.com

For the Defendants:
  CHAMBERLAIN, HRDLICKA, WHITE
  WILLIAMS & AUGHTRY
  1200 Smith Street, Suite 1400
  Houston, Texas 77002
  By: William S. Helfand, Esq.
  bill.helfand@chamberlainlaw.com

INDEX

EXAMINATION OF JANINE LAVIGNE     Page
  By Mr. Helfand     3

Signature/Correction Page
Certificate of Completion of Deposition

EXHIBITS

None

## Page 3

        JANINE LAVIGNE
was called as a witness and, having been first duly sworn, was examined and testified as follows:
        EXAMINATION
By Mr. Helfand:

Q. Ma'am, would you tell me your full legal name, please?

A. **Janine Louise LaVigne.**

Q. Ms. LaVigne, where do you live?

A. **9000 Sunfish Avenue, Southwest, Albuquerque, New Mexico, 87121.**

Q. How long have you lived there?

A. **17 years.**

Q. I'm an attorney for First National Bank of Texas. I represent them in connection with a lawsuit that you filed against them. Do you understand who I represent?

A. **Yes, sir.**

Q. Great. I'm going to ask you some questions today about the claims that you have and some issues in the lawsuit that has been filed on your behalf and what I need you to do if you could, please, is give me truthful, accurate, reliable information in response to the questions I ask. Can you do that, please?

A. **Yes, sir.**

## Page 4

Q. The best way I find to do that is if you would, please listen carefully to the question that is being asked. Think about the question, make sure before you say anything that you feel comfortable that you can provide truthful, accurate and reliable information in response to the question. Then and only then tell me or your lawyer if he asking questions, the answer to the question. Will you do that, please?

A. **Yes, sir.**

Q. Thank you. Now, the other side of that is, if there is anything about the question that you don't understand, doesn't make sense to you, you need more information, you are just not sure that you can provide truthful reliable and accurate information, would you please tell whoever asks the question rather than answer a question that maybe you really don't understand? Can you do that?

A. **Yes, sir.**

Q. Based on what we discussed so far, if you answer a question that I have asked you or a question that your lawyer has asks you, without telling the person that asked the question there is a problem or something about the question that needs clarification, I'm going to assume that you understand the question and that I can rely on your answer. Does that make sense to you?

5

1  A.  Yes, sir, it does.
2  Q.  Great. Most of the time my questions will
3  call for a yes or no answer but you may want to tell me
4  more and I want to know everything that you think is
5  responsive to the question. So, feel free to let me
6  know. The only thing I ask, if the question calls for a
7  yes or no, could you tell me the yes or no first and then
8  tell me whatever else you want me to know? Could you do
9  that?
10  A.  Yes, sir.
11  Q.  Sometimes you might not be done but I might
12  think you are done. If that happens and you have more to
13  say, would you say something or hold your hand up so I
14  can stop talking and let you finish. Will you do that,
15  please?
16  A.  Sure.
17  Q.  By the same token, sometimes you might think
18  you know exactly what I'm going to ask before I even
19  finish talking. What I would ask you to do, please, wait
20  until you hear the whole question, first so you clearly
21  know what question you are about to answer and second so
22  this nice gentleman seated on your right can write down
23  one person talking at a time. Can you do that for me,
24  please?
25  A.  Yes.

6

1  Q.  Great. Now, if you need to take a break, we
2  can certainly do that. What I would like you to do is
3  just tell me if I'm the person asking questions, "Hey, I
4  need to take a break, stretch my legs, use the wash room,
5  get more water," whatever it is. The only thing that I
6  ask, could you tell me a couple of minutes in advance so
7  I can finish what I'm talking about before we take our
8  break?
9  A.  Yes, sir.
10  Q.  Thank you. Is there anything about your
11  physical condition or your mental condition that would
12  make it difficult for you to sit here today for a couple
13  of hours and answer questions about your lawsuit and the
14  issues in your lawsuit?
15  A.  No, not at all.
16  Q.  Great. Do you take any prescription
17  medications at all?
18  A.  Yes, sir, I do.
19  Q.  What do you take?
20  A.  Thyroid.
21  Q.  For your thyroid. How long have you taken
22  thyroid.
23  A.  For the last two years.
24  Q.  Do you have a fast or slow thyroid?
25  A.  Oh, no, sir, it's slow.

7

1  Q.  You take a thyroid supplement?
2  A.  Yes, sir.
3  Q.  Now, in the last two years has that affected
4  your ability to think or remember or speak clearly at any
5  time that you could tell?
6  A.  No.
7  Q.  Could I reasonably understand that the
8  medicine you take for your thyroid shouldn't affect how
9  you testify here?
10  A.  No, not at all.
11  Q.  Would I be correct in that?
12  A.  Yes, sir.
13  Q.  Great. Any other medications besides the
14  thyroid medication?
15  A.  No, sir.
16  Q.  Have you always lived in Albuquerque?
17  A.  No, sir,
18  Q.  Where else have you lived?
19  A.  I was born in Waco, Texas and my father was in
20  the military and we lived in Great Falls, Montana,
21  Mahlstrom Air Force Base.
22  Q.  Nobody could fault you for moving from Great
23  Falls, Montana.
24  A.  I miss it.
25  Q.  We are here about some calls to your cell

8

1  phone that as I understand it, you received in the summer
2  of 2014; is that correct?
3  A.  Yes, sir.
4  Q.  And is that your cell phone that ends in 4951?
5  A.  Yes.
6  Q.  And in the summer of 2014, who was your cell
7  phone provider for the phone number that ended in 4951?
8  A.  Cricket.
9  Q.  And do you still have the cell phone that ends
10  in 4951?
11  A.  Yes, sir, I do.
12  Q.  How long approximately before 2014 did you
13  first have that cell phone number?
14  A.  I had the -- I got that number in March of
15  2014.
16  Q.  From March 2014 up until today you have had
17  that cell phone number?
18  A.  Yes, sir.
19  Q.  Have you had any other cell phone numbers?
20  A.  Yes, sir.
21  Q.  I will come back to that in a second. Let's
22  talk about the 4951. Ms. LaVigne, other than Cricket
23  Wireless, has that cell phone number ever been one that
24  you used with a different cell phone provider?
25  A.  No.

### Page 45

1  you ask Cricket in writing or did you call somebody?
2  **A.  I called their 611 information number.**
3  Q.  The support number?
4  **A.  Yes.**
5  Q.  Do you know who you talked to?
6  **A.  No.**
7  Q.  Did you ever follow-up and ask for that in
8  writing?
9  **A.  No.  No, I didn't.**
10 Q.  Maybe I asked this before and I apologize, I
11 really do have a bad memory.  It's because I write so
12 poorly that sometimes I can't read those.  Are you aware
13 of anyone else who claims to have been called by this
14 same number that you've identified was calling you, at
15 any time?
16 **A.  No.**
17 Q.  Do you know anybody else like that?
18 **A.  No, sir, I don't.**
19 Q.  Anybody else told you they know somebody else
20 who was called by that number?
21 **A.  No, sir.**
22 Q.  Prior to speaking to Sylvia -- by the way did
23 you get Sylvia's last name?
24 **A.  No, I did not.**
25 Q.  When you spoke to Sylvia, did she tell you why

### Page 46

1  you were receiving the calls from the bank?
2  **A.  She told me it was an attempt to collect a**
3  **debt.**
4  Q.  All right.  Did she tell you why the calls
5  were coming to your cell phone number?
6  **A.  Apparently Ms. Lucero used that number when**
7  **she acquired the debt.**
8  Q.  Do you have any information -- by the way,
9  that's something that Sylvia told you?
10 **A.  Yes.**
11 Q.  Do you have any information that that's not
12 true or incorrect in any way?
13 **A.  I have no way to verify that.**
14 Q.  If the bank said, The reason we are calling
15 your cell phone number is one of our customers listed
16 that number as the number we could reach her," you would
17 say, I don't know one way or the other whether that's
18 correct?
19 **A.  Correct.**
20 Q.  Do you know Ms. Lucero?
21 **A.  No.**
22 Q.  Have you tried to track down who Belinda
23 Lucero is to see if she might have had a different name
24 which might be somebody you knew?
25 **A.  I don't know of anybody named Belinda Lucero**

### Page 47

1  **and I haven't made any effort to try to track her down.**
2  **In this neck of the woods it's a common name.**
3  Q.  Both Belinda and Lucero?
4  **A.  Yes.**
5  Q.  So, when you spoke to Sylvia, she told you
6  that the reason the bank representatives were calling you
7  was because a woman named Belinda Lucero had listed your
8  phone number as her contact number.  Did I say that
9  correctly?
10 **A.  Yes.**
11 Q.  What was your response to that?  What did you
12 tell Sylvia?
13 **A.  That may be the number that Ms. Lucero has**
14 **listed.  As of March of 2014, that has been my personal**
15 **phone number.**
16 Q.  And what did Sylvia say in response to that?
17 **A.  I asked her to take my number off their call**
18 **list and quit calling, please.**
19 Q.  Did she tell you she would do that?
20 **A.  She said she would but the calls still**
21 **continued.**
22 Q.  My question was, did Sylvia tell you on that
23 call that she would remove your number from the list?
24 **A.  Yes.**
25 Q.  You want to tell me that even after that call

### Page 48

1  you received more calls from the same number?
2  **A.  Yes.**
3  Q.  Do you recall what time it was or the day when
4  you spoke to Sylvia on July 23rd, 2015?
5  **A.  Maybe a little bit after 8:00 because they**
6  **would call me either 8:05, 8:06 or 8:07 in the morning.**
7  Q.  Is that your guess based on when the calls
8  came in or do you have a recollection of when you spoke
9  to Sylvia?
10 **A.  That's when the call came in and was logged by**
11 **my phone.**
12 Q.  Did you try to reach Sylvia or a supervisor
13 back after July 23rd, 2015?
14 **A.  No, I informed my legal counsel that the calls**
15 **were continuing.**
16 Q.  So, by then you had a lawyer?
17 **A.  Yes.**
18 Q.  When did you hire a lawyer?
19 **A.  June of last year.**
20 Q.  Okay.  Did your lawyer or anyone else on your
21 behalf contact the bank and ask that the calls stop?
22 **A.  I assume Mr. Taylor wrote you guys a letter.**
23 Q.  I'm sorry?
24 **A.  I assume that you were notified by my legal**
25 **counsel to quit calling, please.**

### 49

1  Q. Do you know when that supposedly occurred?
2  A. **No, sir.**
3  Q. In June of 2015, you hired a lawyer because
4  you were upset about the fact that you were receiving
5  calls for Belinda Lucero, even though you asked that they
6  stop. Did I say that correct?
7  A. **Yes.**
8  Q. Is it the lawyer sitting next to us?
9  A. **Yes.**
10 Q. How did you find him?
11 A. **On the Internet.**
12 Q. I don't want to get into any legal advice, but
13 the reason you hired him was because you were getting
14 calls that you didn't want to get on your cell phone and
15 you wanted them to stop, correct?
16 A. **Correct.**
17 Q. Back to my question. After June of 2015 and
18 before filing a lawsuit. Are you aware of anything
19 anyone did, including your lawyer, to try to get the
20 calls to stop?
21 A. **No, sir, I'm not aware.**
22 Q. But that's first and foremost when you hired a
23 lawyer, the get the calls to stop, right?
24 A. **Yes.**
25 Q. So, as of the time you spoke to Sylvia you

### 50

1  already had a lawyer who was to help you get the calls to
2  stop, right?
3          MR. TAYLOR: Objection.
4  A. **I don't recall.**
5  Q. (By Mr. Helfand) You spoke to Sylvia on July
6  23rd, that's after June of 2015, right?
7  A. **Yes, I did speak to her.**
8  Q. So, as of July 23rd you had already hired a
9  lawyer with the hope of getting the calls to stop when
10 you spoke to Sylvia, correct?
11 A. **Yes.**
12 Q. Did you tell Sylvia that you had a lawyer?
13 A. **No.**
14 Q. Why not?
15         MR. TAYLOR: Objection.
16 A. **She wasn't interested.**
17 Q. (By Mr. Helfand) You don't know what she was
18 interested in. My question is, did you tell her you had
19 a lawyer? You told me you did not, right?
20 A. **I did not tell her.**
21 Q. Why did you choose not to tell her that?
22 A. **We weren't sure what company you were.**
23 Q. What difference did it make what company you
24 were with to tell somebody you have a lawyer?
25 A. **Don't you have to let legal representation**

### 51

1  take over at that point?
2  Q. I don't know and I can't answer your
3  questions. I might have an opinion that is different
4  from yours or your attorney's so it really wouldn't
5  matter. My question was -- just explain to me. You are
6  on the phone with a lady who you are asking to help get
7  the calls to stop, right?
8  A. **Correct.**
9  Q. That's the purpose to try to get the calls to
10 stop, right?
11 A. **Yes.**
12 Q. By then you had already consulted with a
13 lawyer to try to get them to help get the calls to stop?
14 A. **Yes.**
15 Q. But the calls hadn't stopped even when you
16 hired a lawyer to do that very thing, right?
17 A. **Correct.**
18 Q. My question is, you chose not to tell Sylvia
19 that you hired a lawyer for that purpose, right?
20 A. **I didn't tell her.**
21 Q. That's right and my question, why did you
22 choose not to do that?
23         MR. TAYLOR: Objection.
24 A. **I don't know.**
25         MR. HELFAND: What is the form

### 52

1  objection?
2          MR. TAYLOR: Argumentative.
3          MR. HELFAND: I'm not sure you
4  understand what argumentative means.
5          MR. TAYLOR: She answered your
6  question.
7          MR. HELFAND: Argumentative means
8  making your argument through the witness.
9          MR. TAYLOR: I stated my objection,
10 counsel.
11         MR. HELFAND: Yes, you have.
12 Q. (By Mr. Helfand) It says in paragraph 20 of
13 your lawsuit, "The cell phone number called by defendant
14 was and is assigned to a cellular telephone service for
15 which the plaintiff incurred charges for incoming calls."
16 Did I read that correctly?
17 A. **Yes.**
18 Q. But that's not true, is it, Ms. LaVigne? You
19 do not incur a charge for incoming calls, do you?
20         MR. TAYLOR: Objection.
21 A. **No, I don't.**
22         MR. HELFAND: What's the objection?
23         MR. TAYLOR: That's not correct.
24 That's not what she testified to.
25         MR. HELFAND: Actually that is what